UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JIMMY PATTON, ROBERT TEACHOUT,
MARIE DALLAIRE and GARY GREGORY,
for themselves and others similarly situated,

                                                    Plaintiffs,

                    - vs -

TOPPS MEAT COMPANY, LLC,                              Civil Action No. 07cv654S
WAL-MART STORES, INC., PATHMARK
STORES, INC., WAKEFERN FOODCORP. d/b/a
SHOPRITE, SHOPRITE OF KINGSTON, and
RASTELLI FINE FOODS, LTD.,

                                                    Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Mark Molloy, Esq.
Nixon Peabody, LLP
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Tel:  (716) 853-8100
Email:  mmolloy@nixonpeabody.com

*Of Counsel:*
Alan M. Maxwell, admitted *pro hac vice*
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
950 East Paces Ferry Road, Suite 3000
Atlanta, GA 30326
Tel: 404-876-2700
Email: amaxwell@wwhgd.com

Christopher T. Lee, admitted *pro hac vice*
Dickie, McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402
Tel: 412-281-7272
Email: clee@dmclaw.com

*Attorneys for Topps Meat Company, LLC,
Wal-Mart Stores, Inc., Pathmark Stores, Inc.,
Wakefern Foodcorp., d/b/a ShopRite and ShopRite of
Kingston*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

PROCEDURAL BACKGROUND ............................................................................................. 2

STATEMENT OF FACTS ........................................................................................................... 3

I.    September 25 and 29, 2007 Recalls ............................................................................. 3

II.   Refund ........................................................................................................................... 3

III.  Class Representatives .................................................................................................. 4

     A.   Jimmy Patton ...................................................................................................... 4

     B.   Gary Gregory ..................................................................................................... 5

     C.   Robert Teachout ................................................................................................ 6

IV.  Opinion of Herbert L. DuPont, M.D. ...................................................................... 6

ARGUMENT ................................................................................................................................... 8

I.    No Adversarial Product Liability Personal Injury Class in Federal Court Has Been
Successful Since the Supreme Court's Decision in *Amchem* Over a Decade Ago ...................... 8

II.   The Proposed Classes Are Not Certifiable Under Rule 23(a) ............................................... 9

     A.   The Proposed Classes Are Not Adequately Defined and Ascertainable ............................ 9

          1.   Plaintiffs' Personal Injury Class Definition Is Defective ......................................... 10

          2.   Plaintiffs' Purchaser Class Definition Is Defective ................................................. 11

              a.   Plaintiffs' Putative Purchaser Class is Subjective and Self Selecting ............... 11
              b.   The Putative Purchaser Class Is an Impermissible Fail-Safe Class ................... 12

     B.   Plaintiffs Have Not Satisfied The Numerosity Requirement ............................................. 13

     C.   The Claims of Class Representatives for the Putative Personal Injury Class Are Not
"Typical" of the Class as a Whole ..................................................................................... 15

          1.   Plaintiffs' Do Not Make a Claim Against Pathmark ............................................... 16

     D.   The Named Plaintiffs and Their Attorneys Will Not Fairly and Adequately Protect The
Interests of the Class .......................................................................................................... 17

III.  Neither Class Is Certifiable Under Rule 23(b)(1) ................................................................ 19

IV.  Neither Class Is Certifiable Under Rule 23(b)(3) ................................................................ 20

     A.   The States' Consumer Protection Laws and Common Laws Vary Widely; Thus, Common
Legal Issues Do Not Predominate ..................................................................................... 21

          1.   New York's Choice-of-Law Principles Preclude Application of a Single State's Law
.................................................................................................................................... 21

|   | 2. | The Substantial Differences in the Forty-Five Consumer Protection Laws Cited by Plaintiffs Preclude Certification under Rule 23(b)(3) | 23 |
|   | 3. | Strict Liability and Negligence Laws Vary Widely Among the States | 25 |
|   | 4. | Punitive Damages Laws Also Vary Widely Among the States and Cannot Be Uniformly Imposed | 26 |
| B. | | Common Questions of Fact Do Not Predominate | 26 |
|   | 1. | Plaintiffs Cannot Manufacture "Predominance" by Listing Largely Uncontested Issues and Ignoring the Material Variations Among the States | 26 |
|   | 2. | Exposure, Injury, Causation, Damages and the Personal Injury Class Members' Unique Medical Backgrounds Create Individual Issues | 27 |
| C. | | Class Certification Is Not The Superior Method of Adjudication | 30 |
| D. | | Application of The Four Factors Does Not Support Certification | 31 |
|   | 1. | Class Members Have an Interest in Individually Controlling the Prosecution of Separate Actions | 31 |
|   | 2. | The Extent of Existing Litigation Does Not Warrant Class Certification | 32 |
|   | 3. | Class Treatment Is Not Manageable | 32 |
| V. | | Issue Certification Is Not Proper Under Rule 23(c)(4) | 32 |
| A. | | Class Certification Would Not Materially Advance Nor Offer Any Advantage in the Expeditious Resolution of These Cases | 34 |
| CONCLUSION | | | 35 |

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Alabama v. Blue Bird Body Co.*
573 F.2d 309 (5th Cir. 1978) ................................................................................................29

*Allison v. Citgo Petroleum Corp.*
151 F.3d 402 (5th Cir. 1998) ................................................................................................31

*Alston v. Crown Auto, Inc.*
224 F.3d 332 (4th Cir. 2000) ................................................................................................23

*Amchem Prods., Inc. v. Windsor*
521 U.S. 591 (1997).......................................................................................................*passim*

*Ansari v New York Univ.*
179 F.R.D. 112 (S.D.N.Y. 1998)...........................................................................................12

*Arthur Young & Co. v. United States Dist. Court*
549 F.2d 686 (9th Cir. 1977) ................................................................................................32

*Castano v. Am. Tobacco Co.*
84 F.3d (5th Cir. 1996) ............................................................................................23, 24, 29

*Cuming v. South Carolina Lottery Comm'n*
2008 WL 906705 (D.S.C. 2008) .............................................................................................9

*Dauphin v. Chestnut Ridge Transp. Inc.*
2009 WL 2596636 (S.D.N.Y. Aug. 20, 2009).......................................................................16

*Deflumer v. Overton*
176 F.R.D. 55 (N.D.N.Y. 1997) ............................................................................................12

*Demarco v. Edens*
390 F.2d 836 (2d Cir. 1968)..................................................................................................12

*Doe v. Karadzic*
192 F.R.D. 133 (S.D.N.Y. 2000)...........................................................................................18

*Dungan v. Acad. at Ivy Ridge*
2009 WL 2604356 (2d Cir. Aug. 20, 2009)..........................................................................32

*Dunnigan v. Metro. Life Ins. Co.*
214 F.R.D. 125 (S.D.N.Y. 2003)....................................................................................10, 19

*Easter v. Am. West Fin.*
   381 F.3d 948 (9th Cir. 2004) ...................................................................................15

*Emig v. Am. Tobacco Co., Inc.*
   184 F.R.D. 379 (D. Kan. 1998) ................................................................................26

*Fogel v. Zell*
   221 F.3d 955 (7th Cir. 2000) ...................................................................................29

*Forman v. Data Transfer, Inc.*
   164 F.R.D. 400 (E.D. Pa. 1995) ..........................................................................9, 11

*Gen. Tel. Co. v. Falcon*
   457 U.S. 147 (1982)..............................................................................................14, 16

*Haun v. Don Mealy Imports, Inc.*
   285 F. Supp. 2d 1297 (M.D. Fla. 2003)...................................................................23

*In Re Agent Orange Prods. Liab. Litig.*
   506 F. Supp. 762 (E.D.N.Y. 1980)...........................................................................18

*In re Baycol Prods. Litig.*
   218 F.R.D. 197 (D. Minn. 2003) .........................................................................8, 14

*In re Bendectin Prods. Liab. Litig.*
   749 F.2d 300 (6th Cir. 1984) ...................................................................................19

*In re Bridgestone/Firestone, Inc.*
   288 F.3d 1012 (7th Cir. 2002) ...................................................................8, 21, 29, 31

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*
   194 F.R.D. 332 (D.N.J. 1997)..............................................................................10, 21

*In re Fosamax Prods. Liab. Litig.*
   248 F.R.D. 389 (S.D.N.Y. 2008).................................................................................9

*In re Kirschner Med. Corp. Sec. Litig.*
   139 F.R.D. 74 (D. Md. 1991) ....................................................................................16

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*
   170 F.R.D. 417 (E.D. La. 1997) ................................................................................23

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*
   209 F.R.D. 323 (S.D.N.Y. 2002)..................................................................................9

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*
   457 F.Supp.2d 298 (S.D.N.Y. 2006)......................................................................7, 26

*In re Paxil Litig.*
    212 F.R.D. 539 (C.D. Cal. 2003) ....................................................... 8, 32

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*
    208 F.R.D. 625 (W.D. Wash. 2002) ............................................. 8, 10, 30

*In re Relafen Antitrust Litig.*
    221 F.R.D. 260 (D. Mass. 2004) ......................................................... 21

*In re Rezulin Prods. Liab. Litig.*
    210 F.R.D. 61 (S.D.N.Y. 2002) ..................................................... 29, 31

*In re Ski Train Fire*
    220 F.R.D. 195 (S.D.N.Y. 2003) ......................................................... 8

*In re St. Jude Medical, Inc.*
    425 F.3d 1116 (8th Cir. 2005) ............................................................. 8

*In re Tetracycline Cases*
    107 F.R.D. 719 (W.D. Mo. 1985) ............................................. 31, 32, 33

*In re Vioxx Prods. Liab. Litig.*
    2008 WL 4681368 (E.D. La. 2008) ................................................... 8, 9

*In re Vioxx Prods. Liab. Litig.*
    239 F.R.D. 450 (E.D. La. 2006) ................................................. 7, 15, 26

*In Re: ConAgra Peanut Butter Prods. Liab. Litig.*
    251 F.R.D. 689 (N.D. Ga. 2008) .............................................. 1, 19, 26, 30

*In re: Rhone-Poulenc Rorer, Inc.*
    51 F.3d 1293 (7th Cir. 1995) ............................................................. 24

*Jacobs v. Osmose, Inc.*
    213 F.R.D. 607 (S.D. Fla. 2003) ......................................................... 8

*Jefferson v. Lead Indus. Ass'n, Inc.*
    106 F.3d 1245 (5th Cir. 1997) ........................................................... 24

*Jewell v. Med. Protective Co.*
    2003 WL 22682332 (D. Conn. 2002) .................................................. 23

*Jones v. CCH-LIS Legal Info. Services*
    1998 WL 671446 (S.D.N.Y. Sept. 28, 1998) ......................................... 11

*Kemp v. Metabolife Int'l, Inc.*
    2002 WL 113894 (E.D. La. 2002) ................................................... 7, 26

*Kern ex. rel. Estate of Kern v. Siemens Corp.*
    393 F.3d 120 (2d Cir. 2004), *cert. denied*, 544 U.S. 1034 (2005) ........................................................8

*Key v. Gillette Co.*
    782 F.2d 5 (1st Cir. 1986) ........................................................................................................16

*Kirkpatrick v. J.C. Bradford & Co.*
    827 F.2d 718 (11th Cir. 1987) ..................................................................................................24

*Klaxon Co. v. Stentor Elec. Mfg. Co.*
    313 U.S. 487 (1941)..................................................................................................................19

*Koenig v. Benson*
    117 F.R.D. 330 (E.D.N.Y. 1987) ............................................................................................16

*Lester v. Percudani*
    217 F.R.D. 345 (M.D. Pa. 2003) ............................................................................................23

*M.O.C.H.A. Society, Inc. v. City of Buffalo*
    2008 WL 343011 (W.D.N.Y. Feb. 6, 2008) ..........................................................................13

*Martin v. Shell Oil Co.*
    198 F.R.D. 580 (D. Conn. 2000) ......................................................................................12, 13

*McLean v. Merrifield*
    2002 WL 147607 (W.D.N.Y. June 28, 2002)..............................................................12, 13, 14

*Norwood v. Raytheon Co.*
    237 F.R.D. 581 (W.D. Tex. 2006) ............................................................................................7

*O'Shea v. Littleton*
    414 U.S. 488 (1974)..................................................................................................................16

*Perez v. Metabolife Int'l, Inc.*
    218 F.R.D. 262 (S.D. Fla. 2003) ....................................................................................9, 10, 11

*Philips Petroleum Co. v. Shutts*
    472 U.S. 797 (1985)..........................................................................................................20, 21

*Pickett v. IBP, Inc.*
    197 F.R.D. 510 (M.D. Ala. 2000) ............................................................................................13

*Robidoux v. Celani*
    987 F.2d 931 (2d Cir. 1993)......................................................................................................12

*Sanneman v. Chrysler Corp.*
    191 F.R.D. 441 (E.D. Pa. 2000) ..............................................................................................29

*Sweet v. Pfizer, Inc.*
  232 F.R.D. 360 (C.D. Cal. 2005) ............................................................... 8, 14

*Thompson v. Bd. of Educ. of Romeo Cmty. Schs.*
  709 F.2d 1200 (6th Cir. 1983) ...................................................................15

*Warren v. Xerox Corp.*
  2004 WL 1562884 (E.D.N.Y. Jan. 26, 2004) ........................................ 13, 17

*Wethington v. Purdue Pharma LP*
  218 F.R.D. 577 (S.D. Ohio 2003) ...............................................................8

*Zinser v. Accufix Research Institute, Inc.*
  253 F.3d 1180 (9th Cir. 2001) ...................................................................30

## OTHER STATE CASES

*Cooney v. Osgood Mach., Inc*.
  81 N.Y.2d 66 (1993) ............................................................................ 20, 22

*Crowe v. Tull*
  126 P.3d 196 (Colo. 2006) ........................................................................22

*Goshen v. Mut. Life Ins. of New York*
  98 N.Y.2d 314 (2002) ...............................................................................20

*Hoffman v. Jones*
  280 So. 2d 431 (Fla. 1973) ........................................................................24

*Intratex Gas Co. v. Beeson*
  22 S.W.3d 398 (Tex. 2000) ........................................................................11

*Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*
  761 So.2d 1256 (Fla. 2000) ........................................................................22

*Swanson v. Bankers Life Co.*
  450 N.E.2d 577 (Mass. 1983) .....................................................................23

*Winslow v. Lewis-Shepard, Inc.*
  562 A.2d 517 (Conn. 1989) ........................................................................24

*Yellowpine Water User's Ass'n v. Imel*
  670 P.2d 54 (Idaho 1983) ..........................................................................23

## OTHER STATE STATUTES

ALASKA STAT. § 09.17.020 (2008) ...................................................................25

ARK. CODE ANN. § 16-55-211 (2008) .............................................................25

COLO. REV. STAT. § 6-1-105(1)(u) (2007) ................................................................22

COLO. REV. STAT. § 13-21-102 (2008) ...................................................................25

CONN. GEN. STAT. § 52-572n(a) ...............................................................................24

FLA. STAT. ANN. § 768.73 (2008) ............................................................................25

FLA. STAT. §§ 501.203, 501.204 ..............................................................................22

Gen. Bus. Law § 349 ................................................................................................20

IND. CODE § 24-5-0.5-3(c) .......................................................................................23

KAN. STAT. ANN. § 50-634(a), (b), (d) (2005) ........................................................23

KAN. STAT. ANN. § 60-3701 (2007) ........................................................................25

LA. REV. STAT. ANN. § 9:2800.52 (2008) ................................................................24

MINN. STAT. § 549.20 (2008) ...................................................................................25

MISS. CODE ANN. § 11-1-65 (2008) .........................................................................25

MO. ANN. STAT. § 510.263 (2008) ...........................................................................25

N.C. GEN. STAT. ANN. § 1D-30 (2008) ...................................................................25

NEV. REV. STAT. § 42.005 (2008) ............................................................................25

OHIO REV. CODE ANN. § 2307.71(B) (2008) ..........................................................24

TENN. CODE ANN. § 29-28-102(6) (2008) ...............................................................24

UTAH CODE ANN. § 13-11-4(2) (2005) ....................................................................22

WASH. REV. CODE ANN. § 7.72.010 (2008) ............................................................24

**OTHER AUTHORITIES**

5 Moore's Federal Practice, § 23.25[1] (Matthew Bender 3d ed. 1997) ..................16

FED. R. CIV. P. 23 .............................................................................................*passim*

FED. R. EVID. 407 ....................................................................................................26

Restatement (Second) of Torts § 402A ....................................................................23

## INTRODUCTION

Since the Supreme Court's decision in *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) (finding mass torts generally unsuitable for class certification), there has not been a successful certification of a non-settlement personal injury (that implicated non-uniform injuries) products class <u>in any federal court anywhere in the nation</u>, and for good reason. The highly individualized issues in personal injury litigation simply are not amenable to class resolution. Because common questions do not predominate over individual questions in personal injury cases, a class offers no advantage over other forms of litigation, *i.e.*, a class is not "superior" to other methods of adjudication.

Mass torts involving food-borne illness outbreaks are not an exception to the *Amchem* rule. Recently, in *In Re: ConAgra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689 (N.D. Ga. 2008), plaintiffs' filed a motion for certification of two classes, a Purchaser Class and a Personal Injury Class, following an outbreak of *Salmonella* associated with ConAgra's Peter Pan and Great Value brand peanut butter. (A copy of the *ConAgra* decision is attached as Ex. A). There, the Court rejected both classes finding, *inter alia*:

- "the combination of significant individualized questions going to liability and the need for individualized assessments of damages precludes Rule 23(b)(3) certification;" *Id*. at 698.

- a refund program was superior to class litigation; *Id*. at 700.

- "certification of a personal injury class or an issues class would not dispose of a single case or eliminate the need for a single trial;" *Id*. at 701.

- plaintiffs' common issues were largely uncontested and would still require individual trials for each claimant's case on the issues of exposure, injury, causation, and damages. *Id*. at 701.

Like the plaintiffs in *ConAgra*, the Plaintiffs here seek certification of a "Purchaser Class" and a "Personal Injury Class" based on an outbreak of *E.coli* O157:H7 associated with hamburgers made by Topps Meat Company, LLC. Like the plaintiffs in *ConAgra*, these Plaintiffs also seek adjudication of a handful of supposedly common, but largely uncontested, issues on a class basis, after which <u>all claims</u> will then need to be tried individually on the actual, contested issues, such as exposure, injury, causation and damages.

# PROCEDURAL BACKGROUND

On November 28, 2007, Plaintiffs filed an Amended Complaint against Topps Meat Company, LLC, Wal-Mart Stores, Inc., Pathmark Stores, Inc., Wakefern Foodcorp d/b/a ShopRite and ShopRite of Kingston ("Defendants").[1]  In the Amended Complaint, Plaintiffs allege causes of action based on Strict Liability, Negligence, Breach of Implied Warranty of Fitness, Negligence *Per Se*, and Violations of State Consumer Protection and Unfair and Deceptive Acts or Practices Statutes.  Plaintiffs seek to certify two classes, a Personal Injury Class and a Purchaser Class.[2]

In their Memorandum of Law in Support of their Motion for Class Certification (Ptf. Mem., at 1-3), Plaintiffs amended the definitions of their proposed classes to the following:

> Personal Injury Class:  All persons who, on or before September 29, 2007, consumed frozen ground beef products subject to the September 25 and 29, 2007 recalls and who assert or allege claims sounding in personal injury therefrom; and

> Purchaser Class:  All person who purchased ground beef products subject to the September 25 and 29, 2007 recalls and who assert or allege claims sounding in economic losses therefrom.

---

[1]  Plaintiffs' initial Complaint was filed on October 3, 2007, against the Defendants as well Rastelli Fine Foods, Ltd.  (See Docket No. 1).  Plaintiffs' Amended Complaint, dated November 28, 2007, added Strategic Investments & Holdings, Inc. as a defendant.  (See Docket No. 5).  Ultimately, Plaintiffs voluntarily dismissed their claims against Strategic Investments & Holdings, Inc. and Rastelli Fine Foods, Ltd.  (See Docket Nos. 84 and 86, respectively).

[2]  To date, nine individual personal injury actions have been filed: *Tedder v. Wal-Mart Stores, Inc., et al.*, N.D. Okla., No. 09-cv-85-GKF-PJC; *Safranek v. Wal-Mart Stores, Inc., et al.*, S.D. Fla. No. 07-61533; *Stepp v. Wal-Mart Stores, Inc., et al.*, Commonwealth of Kentucky, Warren Circuit Court, No. 07-CI-1791; Ortiz v. Topps Meat Company, LLC, et al., Sup. Ct. of New Jersey, No. L 6415-08; *Schlosser v. Topps Meat Company, LLC, et al.*, Sup. Ct. of New Jersey, No. MID-L-1851-08; *McDonald v. Topps Meat Company, LLC, et al.*, New York State Supreme Court, Albany County, No. 7817-07; *Goodwin v. Topps Meat Company, LLC, et al.*, New York State Supreme Court, Tompkins County, No. 1017-07; *Abebrado, et al. v. Topps Meat Company, LLC, et al.*, D.C. No. 09-cv-1838.

**STATEMENT OF FACTS**

**I.    September 25 and 29, 2007 Recalls.**

On September 25, 2007, Topps voluntarily recalled approximately 331,582 pounds of frozen ground beef products due to a possible *E.coli* O157:H7 contamination.  (See Ex. B, FSIS - Recall Release 09/25/07). The recall included all frozen ground beef products bearing the establishment number "Est. 9748" that were produced on June 22, July 12, and July 23, 2007.  (*Id.*).  On September 29, 2007, Topps voluntarily expanded the recall to include a total of 21.7 million pounds of frozen ground beef products produced between September 25, 2006 and September 25, 2007.  (See Ex. C, FSIS - Recall Release , 09/29/07).

On October 26, 2007, the Centers for Disease Control and Prevention ("CDC") reported that 40 cases of *E.coli* O157:H7 infection had been identified by Pulsed Field Gel Electrophoresis ("PFGE") with patterns matching at least one of the patterns of *E.coli* strains found in Topps' frozen ground beef patties.  (See Ex.D, CDC Press Release, 10/27/07, Topps-CDC-FOIA-00515).   The 40 cases were located in eight states: Connecticut (2), Florida (1), Indiana (1), Maine (1), New Jersey (9), New York (13), Ohio (1) and Pennsylvania (12).  The age range and median age were 1-77 and 19 years of age, respectively.  Eighteen of the cases were females (45%).  In 23 of 27 (85%) persons from whom data were available, grossly bloody stools were passed.  The illness onset range for the 40 cases was July 5, 2007 to September 24, 2007.  (See Ex. E, DuPont Report, at pp. 3-4).  Ranchers Beef, Ltd. was identified as the likely source of the contaminated meat provided to Topps for processing, after discovering that raw materials at the Ranchers facility had yielded a PFGE *E.coli* pattern matching the pattern from patients who were ill with *E.coli* O157:H7.  (See Ex. F, FSIS News Release, 10/26/07).

**II.    Refund.**

Following the September 2007 recall, both Topps and its retailers publicized the availability of a refund for any customer with product subject to the recall.  Topps offered a full refund to any customer who mailed the sell-by date and UPC code from the Topps' packaging and mailing them to:  "Attn: Recall

-3-

Coordinator, Topps Meat Company, LLC, P.O. Box 219, 1161 E. Broad Street, Elizabeth, NJ 07207." (See Ex.G, Topps' Refund Notice, 09/29/07).

Wal-Mart posted refund information on its website and offered a full refund to anyone who returned the product to any of its stores. (See Ex. H, Wal-Mart Refund Notice; Affidavit of Thomas Bolinger, dated December 21, 2009 ["Bolinger Aff."] ¶¶ 3, 4). Wal-Mart's refund is still available to anyone who returns the products that were subject to the recall. (See Bolinger Aff. ¶ 5). Wakefern and ShopRite posted public notices in their stores regarding the availability of a refund. (See Ex. I, ShopRite Refund Notice; Declaration of Cheryl Macik, dated December 21, 2009 ["Macik Decl."] ¶ 4). In addition, ShopRite called each customer who had used their ShopRite card and had purchased Topps' hamburgers in August or September 2007 to notify them of the recall and the availability of a "full refund." (See Ex. J, PAT-WAKE-00188-190, ShopRite Refund Script). ShopRite's refund is still available to its customers as well. (Macik Decl.. ¶ 5).

III.    **Class Representatives.**

Three Plaintiffs have offered to represent the class: Jimmy Patton, Gary Gregory, and Robert Teachout.[3] All three claim to have suffered a personal injury resulting from the consumption of Topps' hamburgers. Plaintiffs have not identified a class representative who claims to have only been a purchaser of Topps' product subject to the recall.

A.    **Jimmy Patton**

Mr. Patton purchased Sams' Choice Backyard Gourmet Beef Burgers, 75/25, 12 Quarter Pound Round Patties from a Wal-Mart Neighborhood Market on September 15, 2007. (See Ex. K, Patton Ans. to Interrog. at ¶5). The product box allegedly contained a sell-by date of 04/20/08 and UPC code 78742-02933. (*Id.*).

---

[3] Plaintiffs' First Amended Complaint included a fourth proposed class representative, Marie Dallaire, who has since withdrawn from the action.

Mr. Patton consumed the hamburgers on or about September 24, 2007. (See Ex. L, Patton Dep., at pp. 39-41). The hamburgers were thoroughly cooked and did not have any pink on the inside. (*Id*. at p. 42). Mr. Patton first began having symptoms on September 25, 2007, and they lasted for seven to eight days. (*Id*. at pp.44, 57). His symptoms included nausea, fever, diarrhea, bloody diarrhea, loss of appetite, abdominal pains, eye redness, and fatigue. (*Id*. at pp. 56, 57, 60, 66, 67). Mr. Patton went to the hospital on October 1, 2007, and was tested for *E.coli* O157:H7. (*Id*. at pp. 74-76). His stool culture was negative for *E.coli* O157:H7. (*Id*. at pp. 75-76). The doctor told him that he did not have any blood in his stool and that all his vital signs were fine, except for his blood pressure and temperature. (*Id*. at p. 76).

The hamburgers were never tested for *E.coli* O157:H7, and the remaining product is currently in the possession of his niece. (*Id*. at pp. 92-93). Mr. Patton is not making a wage loss claim. (*Id*.). He was aware that Wal-Mart was offering refunds for the recalled Topps' product, but he never attempted to get a refund. (*Id*. at p. 54).

### B.     Gary Gregory

Mr. Gregory's wife purchased Topps' hamburgers from Shoprite on September 18, 2007. (See Ex. M, Gregory Dep., at p. 37). The product contained a sell-by date of 06/25/08 and UPC code 74701-0025. (See Ex. N, Gregory Ans. to Interrog. at ¶5). He consumed some of the hamburgers, which were prepared well-done, the following day. (See Ex. M, Gregory Dep., at pp. 37, 71). He began experiencing symptoms on September 22, 2007, including diarrhea, bloody diarrhea, a fever, stomach cramps, and fatigue. (*Id*. at pp. 46–51, 64). While the other symptoms subsided after a couple of days, Mr. Gregory has continued to experience loose stools on almost a daily basis since September 2007. (*Id*. at p. 67). On October 2, 2007, Mr. Gregory sought medical treatment for his symptoms and underwent testing. (*Id*. at pp. 52-55). Significantly, and like Mr. Patton, his lab work was <u>negative</u> for *E.coli* O157:H7. (*Id*. at p. 55). Mr. Gregory is making a lost wage claim. (*Id.* at p. 86).

Mr. Gregory first learned about the Topps recall from a voicemail left on his answering machine by ShopRite. (*Id*. at p. 23). He could not recall if the voicemail mentioned the availability of a refund. (*Id*. at p. 24). Mr. Gregory discarded the remaining Topps' hamburgers in August of 2009. (*Id*. at p. 41). He did not recall being asked to provide the product to his counsel. (*Id*. at p. 42). The product was never tested for the presence of *E.coli* O157:H7 prior to being discarded. (*Id*. at pp. 84-85).

### C.     Robert Teachout

Mr. Teachout purchased Topps' hamburgers from Wal-Mart on September 27, 2007. (See Ex.O, Teachout Ans. to Interrog. at ¶5). He consumed the product on September 28, 2007, and began feeling symptoms approximately 6-8 hours later.[4] (See Ex. P, Teachout Dep., at pp. 23, 25). His symptoms included stomach pressure, cramping, abdominal pain, runny diarrhea, bloody diarrhea, dizziness, and fatigue. (*Id*. at pp. 24-29). His symptoms lasted approximately three days. (*Id*. at 35). He did not experience any vomiting. (*Id*. at 34). Mr. Teachout did not seek medical treatment for his symptoms. (*Id*. at p. 29).

Mr. Teachout discarded the remaining Topps' hamburgers and packaging after he filed his lawsuit. (*Id*. at pp. 20, 21). Mr. Teachout did not retain any photographs or other documents that can confirm the UPC code or sell-by date alleged to be on the packaging. (*Id*. at p. 23). The Topps' product was not tested for the presence of *E.coli* O157:H7 prior to being discarded. (*Id*. at p. 43; see Ex. O, Teachout Ans. to Interrog. at ¶8). Because Mr. Teachout intended to save the Topps' product for his lawsuit, he testified that "a refund . . . was not an option." (See Ex. P, Teachout Dep., at p. 46). He is not making a wage loss claim. (*Id*. at p. 33).

## IV.     Opinion of Herbert L. DuPont, M.D.

Defendants' expert, Herbert L. DuPont, M.D., a medical doctor specializing in enteric (intestinal) infections, infectious diseases and gastrointestinal disease, reviewed Plaintiffs' medical records (among numerous other documents) and provided the following opinions. Dr. DuPont opined

---

[4] In his Answers to Interrogatories, Mr. Teachout stated that his symptoms began a couple of days later on October 1, 2007. (See Ex.O, Teachout Ans. to Interrog. at ¶6).

that Mr. Gregory's illness was not consistent with *E.coli* O157:H7 because it was short lasting, hemorrhagic colitis was not found by endoscopy or CT scan, and he did not develop any complications from his intestinal illness. (See Ex. E, DuPont Report at p. 4). Dr. DuPont opined that Mr. Patton's symptoms developed outside the range of dates found in the 40 cases implicated in the Topps-associated *E.coli* O157:H7 outbreak; Mr. Patton's stool sample was negative for *E.coli* O157:H7, occult (microscopic) blood, and leukocytes; and his abdominal x-ray and CT scan were both negative for abdominal and intestinal disease. (*Id.*). Finally, Dr. DuPont opined that Mr. Patton was prescribed levofloxacin (an antibiotic), which is inconsistent with a medical diagnosis of *E.coli* O157:H7 infection. (*Id.*). As for Mr. Teachout, Dr. DuPont opined that his symptoms began outside the range of dates of onset found in the 40 associated cases, and further, his incubation period of 6-8 days before the onset of his first symptom "is incompatible with an *E.coli* O157:H7 disease." (*Id.* at pp. 4-5). Accordingly, Dr. DuPont concluded that none of the Plaintiffs "have a Topps-associated case of diarrhea… [or] *E.coli* O157:H7 infection due to the outbreak strain." (*Id.* at p. 6).

Dr. DuPont also provided context for *E.coli* O157:H7 occurring in the U.S., opining that less than 100,000 cases of Shiga toxin-producing *E.coli* ("STEC,"" which includes *E.coli* O157:H7) occur in the U.S. each year; whereas, 450,000 cases of Shigella infection, 1.4 million of Salmonella infection and 1.4-2.4 million Campylobacter infections occur each year. (*Id.* at p. 5). In addition, the clinical expression of *E.coli* O157:H7 is highly variable, *i.e.*, there are no uniform or unique markers/symptoms. (*Id.*). Moreover, the varying symptoms of *E.coli* O157:H7 also vary in severity. (*Id.* at 6). In the absence of a causative agent, development of diarrhea after consumption of an implicated food is still more likely to be caused by a non-outbreak cause. (*Id.* at 5). While it is true that the CDC has estimated there are 20 cases of undetected STEC infection for each case detected, this extrapolation does not apply during a widely publicized outbreak. In the latter scenario, a high

-7-

percentage of people with diarrhea who have consumed the product in question would have sought evaluation and testing.  (*Id.*).

## ARGUMENT

**I.**    **No Adversarial Product Liability Personal Injury Class in Federal Court Has Been Successful Since the Supreme Court's Decision in *Amchem* Over a Decade Ago**

Plaintiffs seek to certify two classes under Rule 23(b)(3).  To do so, however, they must show that each class meets the four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy – and the two requirements of Rule 23(b)(3) – that common questions of law and fact predominate over questions affecting individual members ("predominance"), and that the class action is superior to other available methods for the fair and efficient resolution of the controversy ("superiority").

The Advisory Committee Notes to the 1966 Amendment to Rule 23(b)(3) expressly state that mass torts ordinarily are not appropriate for class certification, and in the decade since the Supreme Court's decision in *Amchem*, federal court certification of contested products liability personal injury classes has been virtually unheard of.  See *Amchem*, 521 U.S. at 620-22, 625 (mass torts generally are unsuitable for certification); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 298 (S.D.N.Y. 2006) (denying certification of personal injury class on predominance grounds); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) (denying certification of nationwide personal injury and wrongful death class); *Norwood v. Raytheon Co.*, 237 F.R.D. 581 (W.D. Tex. 2006) (denying certification of personal injury class on predominance and superiority grounds); *Kemp v. Metabolife Int'l, Inc.*, 2002 WL 113894, at *3 (E.D. La. 2002) (product liability cases generally do not meet predominance requirement).  These denials of certification include claims, like those asserted here, for negligence, strict liability, or both.  See, e.g., *Sweet v. Pfizer, Inc.*, 232 F.R.D. 360, 363, 375 (C.D. Cal. 2005); *Wethington v. Purdue Pharma LP*, 218 F.R.D. 577, 589 (S.D. Ohio 2003); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 216 (D. Minn. 2003); *Jacobs v.*

*Osmose, Inc.*, 213 F.R.D. 607, 608 (S.D. Fla. 2003); *In re Paxil Litig.*, 212 F.R.D. 539, 542, 554 (C.D. Cal. 2003); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 208 F.R.D. 625, 634 (W.D. Wash. 2002).

Since *Amchem* was decided, only one federal district court of which we are aware has certified a non-settlement product liability personal injury class. See *In re Ski Train Fire*, 220 F.R.D. 195 (S.D.N.Y. 2003). That certification was <u>reversed</u> on appeal. See *Kern ex. rel. Estate of Kern v. Siemens Corp.*, 393 F.3d 120 (2d Cir. 2004), *cert. denied*, 544 U.S. 1034 (2005).[5]

History and precedent do not improve for Plaintiffs in cases asserting only "economic injury," as in their putative Purchaser Class. While courts have occasionally certified non-settlement product liability cases on issues not involving personal injury, they too are almost always reversed. See, e.g., *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005) (reversing certification of consumer protection and medical monitoring classes in prosthetic heart valve litigation); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015, 1021 (7th Cir. 2002) (reversing certification of breach of warranty and consumer fraud claims in tire litigation).

This Court should affirm the strong precedent against certifying mass torts and deny Plaintiffs' Motion for Class Certification.

## II.    The Proposed Classes Are Not Certifiable under Rule 23(a)

### A.    The Proposed Classes Are Not Adequately Defined And Ascertainable

To maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable. *In re Vioxx Prods. Liab. Litig.*, 2008 WL 4681368, at *9 (E.D. La. 2008); see also Manual for Complex Litigation, Fourth, § 21.222 (2004) ("[T]he membership of the class must be ascertainable"). To be ascertainable, "[t]he proposed class definition must not depend on subjective criteria or the merits of the case

---

[5] Even prior to *Amchem*, certified product liability personal injury claims (that survived appeal) were almost unknown; the short list of cases considered and distinguished in *Georgine*, 83 F.3d at 628-29, appears to be practically the universe of mass tort personal injury classes ever certified in a federal court. This small group of pre-*Amchem* cases forms the core of Plaintiffs' authority in support of class certification. (See, e.g., Ptf. Mem., at f.12).

or require an extensive factual inquiry to determine who is a class member." *Cuming v. South Carolina Lottery Comm'n*, 2008 WL 906705, at *1 (D.S.C. 2008). Where a proposed class fails these requirements, certification should be denied. *Vioxx*, 2008 WL 4681368, at *10 (lack of ascertainability "alone is sufficient to warrant striking plaintiffs' class allegations on the pleadings"); *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member").

> 1.    Plaintiffs' Personal Injury Class Definition Is Defective

Plaintiffs' putative Personal Injury Class definition is subjective and self-selecting.[6] Plaintiffs have proposed a class consisting of "All persons who, on or before September 29, 2007, consumed frozen ground beef products . . . and who <u>assert or allege</u> claims sounding in personal injury," (Ptf. Mem., at 1) (emphasis added). An individual "self-selects" to become a member of the proposed class simply by "asserting" or "alleging" that he or she suffered personal injury from the ingestion of frozen ground beef. This class definition does not even require that a member actually suffer a personal injury as a result of *E. coli* O157:H7 (presumably this omission – not defining the class as anyone with an E.coli O157:H7 injury – is purposeful so as to permit Plaintiffs to serve as class representatives despite the fact that not one of them tested positive for *E.coli* O157:H7).

With no objective standard governing "membership," mini-trials (or trials on the merits) would be needed to determine membership in the class, and the efficiencies supposedly attendant to a class action would be lost. See *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995); *Perez v. Metabolife Int'l, Inc.,* 218 F.R.D. 262, 269 (S.D. Fla. 2003). Without individualized inquiry into class membership,

---

[6] As Plaintiffs acknowledge, a class must be presently ascertainable by reference to objective criteria and without the need for individualized inquiry. (Ptf. Mem., at 11). There can be no "state of mind" criteria in the class definition. See *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 209 F.R.D. 323, 336-37 (S.D.N.Y. 2002).

defendants are denied the opportunity to test those self-selecting into the class. See *Perez,* 218 F.R.D. at 269. Because anyone willing to "assert" some type of personal injury allegedly related to the consumption of frozen ground beef products manufactured prior to September 29, 2007 and subject to the September 2007 recalls can become a member of the class, the value of any recovery by individuals with legitimate claims is necessarily diluted.

In addition, the putative Personal Injury Class extends indefinitely; individuals may decide to "assert" a claim at any time. A class is unascertainable if, like here, it has no set cutoff date, *i.e.,* no end to the number of potential class members who might attempt to recover damages. See, e.g., *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 194 F.R.D. 332, 495 n. 10 (D.N.J. 1997).

2.    Plaintiffs' Purchaser Class Definition Is Defective

a.    *Plaintiffs' Putative Purchaser Class is Subjective and Self Selecting*

Plaintiffs' proposed Purchaser Class ("[a]ll persons who purchased and/or consumed ground beef products subject to the September 25 and 29, 2007 recalls and who assert or allege claims sounding in economic losses therefrom," (Ptf. Memo, at 2-3)), also fails the ascertainability requirement because determining class membership would not be administratively feasible. There will be little, if any, "objective" proof that a claimant actually purchased recalled ground beef products, and the class definition requires none (such as a receipt or possession of the product). Consequently, class membership can be determined <u>only</u> by "self-selection"; putative class members alone know whether they purchased recalled ground beef products, how much they purchased, when and where they purchased it, etc.

A class is not certifiable if the court is required to conduct individualized hearings to determine class membership such as the above inquiries. See *PPA Prods. Liab. Litig.*, 214 F.R.D. at 617-20 (certification denied because the individualized issues of identifying a class of decongestant purchasers rendered case unmanageable); *Perez,* 218 F.R.D. at 269 (denied certification of classes of over-the-counter purchasers because individual mini-trials would be required). This is not just a question of "commonality" or

-11-

"superiority" under Rule 23. If individualized inquire is required, then the efficiencies supposedly attendant to a class action will be lost. Conversely, Due Process would be denied if class membership is allowed through purely subjective evidence without allowing Defendants the opportunity to challenge the memory and credibility of the individuals making the claims. See *Perez,* 218 F.R.D. at 269. Either way, Plaintiffs' Purchaser Class fails.

### b.    *The Putative Purchaser Class is an Impermissible Fail-Safe Class*

For class membership to be objective and presently ascertainable, its definition cannot require a determination on the merits. "If the defendant is found liable, class membership is then ascertainable and the litigation comes to an end. A determination that the defendant is not liable, however, obviates the class, thereby precluding the proposed class members from being bound by the judgment." *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404-05 (Tex. 2000) (relying on federal law). The process inevitably creates a "one-sided" outcome.

Here, the Plaintiffs' proposed Purchaser Class does exactly that. Since most of Topps' ground beef was free of contamination, and because ground beef that is cooked at 165 ºF pursuant to the safe handling instructions on Topps' labels would eradicate any *E. coli* actually present in the meat (see Ex. Q, Marsden Dep., at pp. 45-46), most consumers ate all of the meat they purchased without ill effect. Consequently, most consumers attained the full value of their purchase. In addition, <u>all claimants still can obtain a full refund for their purchases</u>, whether or not consumed, simply by participating in the retailers' ongoing refund program. (See Bolinger Aff. ¶ 5; Macik Decl. ¶ 5).

At the very least, the "value" realized by each purchaser of frozen ground beef products will vary and cannot be determined short of a trial on the merits. See *ConAgra*, 251 F.R.D. at 699. Putative classes so defined, as a matter of law, cannot be certified. See *Forman,* 164 F.R.D. at 403.

### B.    Plaintiffs Have Not Satisfied The Numerosity Requirement

A court may only certify if the "class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a).  "Although there is no magic minimum number that breathes life into a class," *Jones v. CCH-LIS Legal Info. Services*, 1998 WL 671446 (S.D.N.Y. Sept. 28, 1998), "an estimate that is based on speculation is insufficient."  *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 590 (D. Conn. 2000); *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (while numerosity does not require evidence of an exact class size or identity of class members, the moving party must provide a reasonable class size estimate); *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968) (disapproving maintenance of class action where assertions of numerosity and impracticability are based on "pure speculation"); *Deflumer v. Overton*, 176 F.R.D. 55, 58-59 (N.D.N.Y. 1997) (holding that "pure speculation . . . is insufficient to satisfy [movant's] burden").

*Martin v. Shell Oil Co.*, *supra*, illustrates this principle.  In *Martin*, the plaintiff filed suit alleging that Shell contaminated the well water running to Martin's residence and to the residences of the prospective class members.  The court held that the numerosity requirement was not satisfied because, other than the two named plaintiffs, it was unclear whether any of the proposed class members had any interest in litigating the issues (or in having the issues litigated on their behalf).  "Thus, it [was] not clear that class treatment would avoid multiple actions."  *Id.* at 591; see also *Ansari v New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998) (denying class certification where the court found it was "not a situation where individual members of the prospective class have filed suit or threatened to file their own actions").

A similar result was reached in *McLean v. Merrifield*, 2002 WL 147607 (W.D.N.Y. June 28, 2002). In that case, plaintiffs sought to certify a class of all persons with mental retardation residing in New York State who were eligible for, but denied, public assistance benefits because of their disabilities.  Judge Elfvin held that the numerosity requirement was not satisfied.  The plaintiff did not attempt to provide the court with a reasonable estimate of the class size, "other than by stating that there [were] at least 708 mentally retarded individuals in Erie County who received public benefits."  *Id.* at *4.  Judge Elfvin held that "[a]lthough [the]

court could very well presume that the class [was] so numerous that joinder would be impracticable. . . , it is impermissible to presume that the requirements for class certification have been satisfied." *Id.*

Further, each proposed class must individually satisfy the numerosity requirement (as well as all of Rule 23 requirements); the number of members for each proposed putative class cannot simply be added together to meet the threshold. *Pickett v. IBP, Inc.*, 197 F.R.D. 510 (M.D. Ala. 2000) ("For the Court to certify the proposed subclasses the plaintiffs must 'meet the numerosity, commonality, typicality, and representation requirements established by Rule 23(a)' for each class *separately*") (emphasis in original); *Warren v. Xerox Corp.*, 2004 WL 1562884, at *17 (E.D.N.Y. Jan. 26, 2004).

Like the plaintiffs in *Martin* and *McLean*, Plaintiffs in this case fail to satisfy the numerosity requirements with respect to either of their proposed classes. As Plaintiffs cite in their motion papers, (Ptf. Mem., at 12), the numerosity requirement is presumed when the proposed class exceeds 40 members. See *M.O.C.H.A. Society, Inc. v. City of Buffalo*, 2008 WL 343011, at *2 (W.D.N.Y. Feb. 6, 2008). However, these Plaintiffs have not given the Court a reasonable estimate of the size of either class; there is no evidence upon which this Court can determine if joinder is impracticable other than Plaintiffs' suggestion that "the CDC and USDA/FSIS have confirmed 40 cases of *E. coli* O157:H7 lined to the outbreak strain" and that "hundreds and thousands of members of the 'Consumer Class' . . . purchased the millions of pounds of recalled contaminated frozen ground beef." (Ptf. Mem., at 13). Plaintiffs do not provide any information as to the 40 incidents or the purchasers of ground beef, other than to state in conclusory fashion that they exist.[7]

---

[7] For example, while the CDC identified 40 cases of *E. coli* O157:H7 with PFGE patterns that match those *E. coli* strains found in ground beef manufactured by Topps', only 33 out of 37 patients had a detailed history that included the consumption of ground beef products. (See Ex. D, CDC Press Release, 10/26/07). Plaintiffs only rely on a 1999 study of underreported food-borne illness cases to bolster the number of class members; that reliance is speculative and unavailing. The findings of that study do not support Plaintiffs' argument that 20 unreported cases exist for every reported case of *E. coli* O157:H7 infection. (See Ex. R, Nataro Dep., at p. 77). Further, the study does not account for how widely-publicized recalls increase the number of reported cases. If that study is given credence in

*(Footnote continued on next page)*

The simple fact is that there are only <u>three</u> Personal Injury Class Plaintiffs and <u>no</u> Purchaser Class Plaintiffs. Plaintiffs have provided nothing but pure speculation as to the number of potential class members (in either class). Similar to *McLean*, there is no evidence in this case (other than Plaintiffs' naked assertions) that other proposed class members have an interest in litigating the issues or in having the issues litigated on their behalf. Therefore, it is not clear that class treatment would avoid multiple lawsuits. As such, Rule 23's numerosity requirement has not been satisfied.

### C.    The Claims of Class Representatives for the Putative Personal Injury Class Are Not "Typical" of the Class as a Whole

Typicality requires that the class representative be a member of the class and suffer the same injury as the class members. See *General Tel. Co.*, 457 U.S. at 156. In the context of personal injury claims, however, there can be little question that class members do not suffer the same injury. Injuries are individual. They may be similar, but proof of one is not proof of another. (See Ex. E, DuPont Report, at p. 5). Thus, in *Baycol, supra,* plaintiffs argued that the claims of the class representatives were typical of the class because the class representatives asserted identical legal claims – personal injury resulting from the ingestion of Baycol under the theories of failure to warn, negligence and design defect. See 218 F.R.D. at 205. However, the named class representatives did not and could not represent the interests of class members because the individual issues involved – injury, causation, learned intermediary doctrine and comparative fault – precluded such representation:

> The underlying facts and circumstances of this case do not make the proposed personal injury class amenable to class certification. This case involves a vast number of persons who took different dosages of Baycol, at different times, and possibly took Baycol concomitantly with other prescription drugs. Because the theories asserted by the putative class are based on what Defendants knew at the time Baycol was prescribed, and whether Defendants acted reasonably based on such knowledge, the claims of the named representatives are not typical of the class.

---

*(Footnote continued from previous page)*

this context, a class could be certified every time three individuals had a food-borne illness. That result would completely undermine the numerosity requirement set forth by Rule 23.

*Id.*; see also *Vioxx*, 239 F.R.D. at 460 (although the asserted claims shared common issues, the individual issues of injury, causation and comparative fault meant they were not typical of the class). The claims are neither common nor typical if the claims of the representative plaintiffs are different from the claims of other class members.

There are no "typical" claims in this litigation either. Every claimant will be subject to a myriad of different circumstances and defenses, particularly relating to their exposure to the hundreds of potential alternative causes for gastrointestinal illness; their eating, drinking, work, recreational, and travel habits; the state of their health; medications they were taking; their exposure to other people or to animals; medical treatments they may be receiving; and a host of other "causation" issues. Consequently, damages will be just as individualized (*e.g.*, Mr. Gregory is asserting a wage loss claim; Mr. Patton and Mr. Teachout are not. Mr. Patton and Mr. Teachout received medical treatment; Mr. Gregory did not.). The substantive laws and defenses applicable to the claims will differ. There simply is no way for any representative to adequately represent the individualized claims of putative class members.

### 1.   Plaintiffs' Do Not Make a Claim Against Pathmark

To meet the typicality requirement, at least one class representative must have been injured by and, thus, have a claim against each and every defendant. If the Complaint does not put forth at least one class representative with a claim as to each defendant, the lack of typicality will preclude class certification, at least as to the "missing" defendants. See *Thompson v. Bd. of Educ. of Romeo Cmty. Schs.*, 709 F.2d 1200, 1204-1205 (6th Cir. 1983); *Easter v. Am. West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (borrowers who sued financial institutions did not have standing to sue defendants who never held any loans of named plaintiffs).

Here, Plaintiffs have failed to plead that any putative class representative purchased or consumed any Topps' product sold by Pathmark. Accordingly, the putative class representatives' claims are not typical of a member of either class with a potential claim against Pathmark.

-16-

2.    Plaintiffs' Claims Are Not Typical of a Member of the Purchaser Class

The proposed Purchaser Class is designed to recover "economic damages" for simply purchasing ground beef products subject to the Topps' recalls.  (See Ptf. Mem., at 2-3).  Here, Patton, Teachout and Gregory seek recovery for <u>alleged personal injuries</u> suffered after consuming ground beef products subject to the recalls.  These putative class representatives do not claim that they suffered the same injury as those sought to be prosecuted on behalf of the Purchaser Class.  Indeed, Teachout and Gregory no longer possess the product in question, having discarded it after filing this lawsuit.  Accordingly, Plaintiffs' claims are not typical of a member of the Purchaser Class who is in possession of an intact package of Topps' frozen ground beef, and did not consume or suffer injury from the same.

**D.    The Named Plaintiffs and Their Attorneys Will Not Fairly and Adequately Protect The Interests of the Class**

To certify Plaintiffs as class representatives, the Court must also find that Plaintiffs "will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  Plaintiffs must show that their interests coincide with those of the putative class members.  *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 79 (D. Md. 1991).  This requirement is the most critical of the class action certification rules because the class representative stands as a fiduciary for the rest of the class members, empowered to bind absent class members to the judgment.  *Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir. 1986) (adequate representation is of critical importance); *Koenig v. Benson*, 117 F.R.D. 330, 333-34 (E.D.N.Y. 1987) (class representative is in a fiduciary relationship with the rest of the class); 5 Moore's Federal Practice, § 23.25[1] (Matthew Bender 3d ed. 1997) (due process requires that the interests of class members be adequately represented).

Here, these putative representatives cannot adequately or fairly represent the interests of the class for at least two reasons: (1) the putative class representatives are not alleged to have suffered the same "injury" as the proposed Purchaser Class and, (2) the putative class representatives have personal interests that are

12820159.4

different from the proposed Purchaser Class. See *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

The proposed Purchaser Class is designed to recover reimbursement for simply purchasing ground beef products subject to the Topps' recalls. (Ptf. Mem., at 2-3). However, Patton, Teachout and Gregory seek recovery based on nothing more than allegations that they were injured after consuming ground beef products subject to the recalls. These putative class representatives do not claim that they suffered the same injury as those sought to be prosecuted on behalf of the Purchaser Class.

The class representatives (all alleged members of the putative Personal Injury Class) also cannot adequately represent the Purchaser Class because they are subject to unique defenses not assertable against other Purchaser Class members. *Dauphin v. Chestnut Ridge Transp. Inc.*, 2009 WL 2596636, at *3 (S.D.N.Y. Aug. 20, 2009) (denying class certification; "[r]egardless of whether the issue is framed in terms of the typicality of the representative's claims, or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it").

Further, putative class representatives Gregory and Teachout not only failed to preserve the allegedly tainted product, they disposed of it after the lawsuit was filed without having it tested. As a result, Defendants are prejudiced in that they are unable to inspect or examine the product. This destruction of the product in question after litigation commenced raises serious questions as to the ability of the class representatives and their counsel to fairly and adequately protect the class.[8]

Finally, Plaintiffs failed to identify separate counsel for each of the two proposed classes. Just as the representatives' personal injuries will overtake the litigation to the detriment of the proposed purchaser class, the same conflict will focus counsel's representation in this action to the issues relating to the putative

---

[8] Moreover, Gregory and Teachout's failure to preserve the ground beef, and Plaintiffs' counsel's failure to secure the same, will give rise to a spoliation claim and undermine their ability to adequately represent either class.

personal injury class.  See *Warren*, 2004 WL 1562884, at fn. 26 (citing *Ortiz*, 527 U.S. at 856).  Plaintiffs have failed to establish that class counsel is qualified and will adequately represent the interests of members of <u>all</u> classes.  Accordingly, Plaintiffs do not meet the Rule 23(a)(4) criteria.

## III.    <u>Neither Class Is Certifiable Under Rule 23(b)(1)</u>

Plaintiffs hope to obtain a "limited fund" certification under Rule 23(b)(1) but have not offered any credible factual evidence to support this request.  Plaintiffs argue that a jury could assess 100% liability to Topps (despite their position that all Defendants are jointly and severally liable).  (Ptf. Mem., at 20).  Plaintiffs argue that, in that scenario, Topps' available insurance proceeds could potentially be the only source of recovery for both classes.  (*Id.* at 20-21).  Plaintiffs, therefore, request a "limited fund" certification based on their belief that $11,000,000 worth of insurance coverage would be "clearly insufficient . . . to fully and fairly compensate the members of the classes."  (*Id.* at 21).  Plaintiffs' request for "limited fund" certification should not be allowed, whether made under Rule 23(b)(1)(A) or (B), because Plaintiffs have failed to demonstrate that the available insurance proceeds would be insufficient.

Rule 23(b)(1) allows for the certification of two different types of class actions, and is designed to provide an <u>equitable</u> remedy for situations in which multiple judgments in individual cases might prove unrecoverable.  *Ortiz*, 527 U.S. at 841.  Under Rule 23(b)(1)(A), certification is proper if it is necessary to protect a defendant from the risk that inconsistent adjudications in individual actions may force the defendant to take inconsistent judgments.  Under Rule 23(b)(1)(B), "limited fund" class action certification is also available when separate actions may cause later claimants to be unable to recover judgments due to awards given out in earlier individual lawsuits.  See, generally, *In Re Agent Orange Prods. Liab. Litig.*, 506 F. Supp. 762, 789 (E.D.N.Y. 1980).

In *Ortiz,* the Supreme Court held that the requirements of a Rule 23(b)(1)(B) limited fund had not been met when the fund was limited only because its amount was fixed as part of a settlement agreement.  Finding the first and most distinctive characteristic of such a fund to be "the inadequacy of the fund to pay all

-19-

claims," the Court ruled that before the requirements of a Rule 23(b)(1) limited fund can be met, the District Court must receive specific evidence from which to ascertain the limit and insufficiency of the fund; the Court should hold a hearing in which that evidence may be challenged and then make specific findings of fact. *Id*. at 848-849, 853 (specific evidentiary findings required).

The standards established in *Ortiz* coincide closely with case law in the Second Circuit, which makes clear that a decision to certify a class based on the existence of a limited fund must be based on specific <u>factual evidence</u>. See, e.g., *Doe v. Karadzic*, 192 F.R.D. 133, 139 (S.D.N.Y. 2000) (for a limited fund to be a vehicle for a (b)(1) certification, there must be evidence of a limited fund and a real risk that it will be exhausted to the detriment of the plaintiffs with meritorious claims). Courts will deny certification under 23(b)(1)(B) where plaintiffs fail to offer evidence of the likely insolvency of defendants because the mere existence of numerous plaintiffs and a large *ad damnum* clause is insufficient to find a limited fund. See, e.g., *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 304 (6th Cir. 1984) ("the district court, as a matter of law, must have a fact-finding inquiry on this question and allow the opponents of class certification to present evidence that a limited fund does not exist"). In this case, Plaintiffs have presented no evidence of a limited or insufficient fund <u>because there exists no such evidence</u>.

Unlike other product liability cases, this is not a multi-district proceeding with several different competing cases. The Plaintiffs are reduced to talking implausibly about a vague "prospect" of a limited fund that might result from inconsistent adjudications or the like. (See Ptf. Mem., at 20-22.) Such speculation is inadequate to obtain certification under Rule 23(b)(1).

## IV.     <u>Neither Class Is Certifiable Under Rule 23(b)(3)</u>

Plaintiffs seeking to certify a class must prove that questions of law or fact common to class members predominate over questions affecting only individual members. FED. R. CIV. P. Rule 23(b)(3). "Predominance" means that the issues in the proposed class action are subject to generalized proof applicable

-20-

to the class as a whole and, thus, predominate over those issues that are subject only to individualized proof. *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 138 (S.D.N.Y. 2003).

> **A.    The States' Consumer Protection Laws and Common Laws Vary Widely; Thus, Common Legal Issues Do Not Predominate.**

Certification of a nationwide class is not possible in this case because variations in state law will "swamp any common issues and defeat predominance."  See *ConAgra*, 251 F.R.D. at 696 ("It goes without saying that class certification is impossible where the fifty states truly establish a large number of different legal standards governing a particular claim").

> 1.    New York's Choice-of-Law Principles Preclude Application of a Single State's Law

In a diversity case, the federal District Court must apply the choice-of-law rules of the state in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941).  Under New York conflicts principles, courts should apply the law of the state with the greatest interest in resolving the issue.  *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993) ("In tort cases, New York aims to give 'controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation'").

"To certify a multi-state class action, a plaintiff must prove through 'extensive analysis' that there are no material variations among the law of the states for which certification is sought."  *Klay*, 382 F.3d at 1262. In their motion, the Plaintiffs do not provide any such analysis.  Instead, relying on *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985), they exaggerate an argument that New York contacts exist in the present action and that New York substantive law should apply.  The test set forth in *Shutts* requires that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *Id*. at 818.  Seeking to apply the *Shutts* test to this case, Plaintiffs erroneously suggest that the contaminated ground beef was manufactured by Topps in New York State; based

-21-

on that erroneous conclusion, they argue that "application of New York substantive law is neither arbitrary nor fundamentally unfair," while completely dismissing the other relevant considerations set forth by the Court.

The alleged contacts with New York in this case do not create a state interest, as New York has no legitimate interest in imposing its laws on non-New York residents who engage in consumer transactions with other non-residents in foreign states. *Goshen v. Mut. Life Ins. of New York*, 98 N.Y.2d 314, 315 (2002) ("To apply [Gen. Bus. Law § 349] to out-of-state transactions . . . would lead to an unwarranted expansive reading of the statute, contrary to legislative intent, and potentially leading to the nationwide, if not global application of Gen. Bus. Law § 349. . . . Furthermore, the interpretation out-of-state plaintiffs would have us adopt would tread on the ability of other states to regulate their own markets and enforce their own consumer protection laws").

The Supreme Court in *Shutts* also highlighted that the expectation of the parties is paramount in assessing fairness. *Shutts*, 472 U.S. at 822. A person who purchases the at-issue product in his or her foreign state has no legitimate expectation that New York law will apply to the transaction. While Plaintiffs emphasize that the class representatives chose to file in New York expecting that New York law would apply, "plaintiff's desire for forum law is rarely, if ever controlling" as "[i]f a plaintiff could choose the substantive rules to be applied to an action . . . the invitation to forum shopping would be irresistible." *Shutts*, 472 U.S. at 820. *Shutts* cautions against taking "a transaction with little or no relationship to the forum and apply[ing] the law of the forum in order to satisfy the procedural requirement that there be a 'common question of law.'" *Id.* at 821.

Choice-of-law principles applicable to consumer cases do not require courts to apply the law of the state in which the defendant is incorporated or headquartered. As explained in *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004), "the primary aim" of consumer protection laws is to compensate consumers,

not to police corporate conduct. "States have a strong interest in protecting consumers with respect to sales within their borders, but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states." *Id.* at 277-78.

In this case, the laws applicable to the consumer class transactions differ, and a "true conflict" exists in that each state has an interest in having its own law applied. *Ford Ignition Switch Litig.*, 174 F.R.D. at 348 ("Each plaintiffs' home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws"); *Bridgestone/Firestone*, 288 F.3d at1018 (states have an interest in applying their own laws to transactions in their own states). Here, the applicable law comes from that state or jurisdiction whose interest would be more impaired if its law were not applied. *Cooney*, 81 N.Y.2d at 72.

Moreover, this choice-of-law analysis confirms that Plaintiffs' proposed Purchaser Class is unworkable, unmanageable and not certifiable. Based on the facts presented, the choice-of-law analysis is highly individualized. The product at issue was manufactured in New Jersey. Plaintiffs allege that thousands of consumers in various states purchased the affected ground beef, and that 45 states' consumer protection laws apply. (See First Amended Complaint, ¶¶ 62-106). The relevant transactions will encompass non-New York residents purchasing the at-issue product in foreign states. The consumer transactions are different for each Plaintiff and the Court will need to scrutinize each transaction to determine the level of New York and other states' interest in the transaction.

> 2.    The Substantial Differences in the Forty-Five Consumer Protection Laws Cited by Plaintiffs Preclude Certification Under Rule 23(b)(3)

In their Motion, Plaintiffs do not account for the substantial differences among the various consumer protection laws.

One principal difference among the states' consumer protection laws is the degree to which a claimant must show that a defendant acted with scienter or knowledge of falsity. For example, Utah law

requires a simple "intent to deceive" before a deceptive trade practice can be found.  UTAH CODE ANN. § 13-11-4(2) (2005).  Colorado, by contrast, requires a showing not just of intent to defraud (see *Crowe v. Tull*, 126 P.3d 196, 204 (Colo. 2006)), but also that a defendant "intended to induce the consumer to enter into a transaction."  COLO. REV. STAT. § 6-1-105(1)(u) (2007).  At the other end of the spectrum, Florida's statute is based on federal standards of "deception," which require neither an intent to deceive nor to induce reliance.  *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So.2d 1256, 1263 (Fla. 2000); FLA. STAT. §§ 501.203, 501.204.

Even the concept of "knowledge" itself is not uniform throughout the states.  States also have different affirmative defenses relating to knowledge.  For example, in Indiana, an act is not "deceptive" if the representations resulted from a bona fide error.  IND. CODE § 24-5-0.5-3(c).  On the other hand, Massachusetts does not require a plaintiff to prove a defendant's knowledge of the misrepresentation or intent to deceive.  *Swanson v. Bankers Life Co.*, 450 N.E.2d 577 (Mass. 1983); MASS. GEN. L. CH. 93A.

In addition, many state consumer protection laws restrict the ability to assert a private cause of action to those who suffered an injury.  Among those states, the laws vary as to what type of injury must be suffered.  For example, some states do not allow a private right of action unless the consumer has suffered "an ascertainable loss" of a pecuniary nature, consisting of money or property; other states require only that the consumer was "aggrieved" by a defendant's conduct.[9]

---

[9] Compare, e.g., *Alston v. Crown Auto, Inc.*, 224 F.3d 332, 336 (4th Cir. 2000) (plaintiff did not show loss resulting from defendant's actions); *Jewell v. Med. Protective Co.*, 2003 WL 22682332, at *1 (D. Conn. 2002) (dismissed claim under CT law because plaintiff did not allege economic loss); *Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003) (denied certification on predominance grounds because PA law required proof of ascertainable loss, raising individualized questions of fact); *Yellowpine Water User's Ass'n v. Imel*, 670 P.2d 54, 56-57 (Idaho 1983) (plaintiff "must suffer some 'ascertainable loss'"); with, e.g., KAN. STAT. ANN. § 50-634(a), (b), (d) (2005) (distinguishing "a consumer aggrieved" from "a consumer who suffers loss"); *Haun v. Don Mealy Imports, Inc.*, 285 F. Supp. 2d 1297, 1307 (M.D. Fla. 2003) (under Florida law, plaintiff must be "aggrieved by the unfair and deceptive act," but it is not sufficient to show "subjective feelings of disappointment" such as "loss of benefit of the bargain damages").

3.    Strict Liability and Negligence Laws Vary Widely Among the States

Federal courts uniformly reject certifying nationwide classes for personal injury claims based on negligence and strict liability theories because, among other things, products liability law differs significantly among states. See *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 423-24 (E.D. La. 1997). Some jurisdictions do not recognize strict liability at all, while others have adopted the Restatement (Second) of Torts § 402A. See *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 742 n.15 (5th Cir. 1996). Even among the states that have adopted the Restatement, there are significant variations. See *id.* (citing 5 Stuart M. Spieser, et al., *The American Law of Torts* §§ 18.31, 18.34-18.35 (1996)).

Moreover, the products liability laws of several jurisdictions have expressly or impliedly subsumed common law negligence or strict liability claims. See CONN. GEN. STAT. § 52-572n(a); LA. REV. STAT. ANN. § 9:2800.52 (2008); OHIO REV. CODE ANN. § 2307.71(B) (2008) (Ohio Products Liability Act is "intended to abrogate all common law product liability claims or causes of action."); TENN. CODE ANN. § 29-28-102(6) (2008); WASH. REV. CODE ANN. § 7.72.010 (2008). This means that these jurisdictions do not recognize laws other than their own statutes as governing common law strict products liability or negligence claims. See, e.g., *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1997) (since the Louisiana Product Liability Act's enactment, "neither negligence, strict liability, nor breach of express warranty is any longer viable as an independent theory of recovery against a manufacturer"); *Winslow v. Lewis-Shepard, Inc.*, 562 A.2d 517, 521 (Conn. 1989) ("the products liability statute provides an exclusive remedy and the plaintiffs cannot bring a common law cause of action for a claim within the scope of the statute").

Differences in affirmative defenses likewise exist. For example, contributory negligence and assumption of risk are complete defenses to products liability claims in some states. See *Castano*, 84 F.3d at 475 n.15 (citing S.C. CODE ANN. § 15-73-20 (1976)). In others, they are a part of comparative fault analysis. See *Hoffman v. Jones*, 280 So. 2d 431 (Fla. 1973) (abolishing doctrine of contributory negligence).

12820159.4

Here, Plaintiffs do not even acknowledge that there are differences among the states' strict liability and negligence laws; although it is their burden to show that the substantive law would be sufficiently uniform to allow class adjudication.  See *Klay*, 382 F.3d at 1262.  Regardless, state law variations in strict liability and negligence law preclude class certification.  See *id.* at 1261; *In re: Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995) (rejecting the notion that a single negligence instruction could be applied nationwide); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n.6 (11th Cir. 1987).

4.    Punitive Damages Laws Also Vary Widely Among the States and Cannot Be Uniformly Imposed

Federal courts routinely reject plaintiffs' attempts to use punitive damages as a predominating factor in class certification because state laws and procedures regarding punitive damages vary considerably.  Nine states either: (i) expressly mandate that fact finders determine punitive damages "concurrently with all other issues presented;" or (ii) require that punitive damages be considered by the "same trier of fact" that determines compensatory damages.[10]  Several other states strongly imply the same thing.[11]  Thus, Plaintiffs have failed to meet their burden to prove that punitive damages laws among the forty-five states cited are uniform.

**B.    Common Questions Of Fact Do Not Predominate**

1.    Plaintiffs Cannot Manufacture "Predominance" by Listing Largely Uncontested Issues and Ignoring the Material Variations Among the States

Plaintiffs have failed to demonstrate that common issues predominate over individual issues with respect to their proposed Purchaser Class.  "Predominance" of common issues over individual issues cannot be manufactured by creating a laundry list of largely <u>uncontested</u> issues while ignoring the need to

---

[10] See ALASKA STAT. § 09.17.020 (2008); KAN. STAT. ANN. § 60-3701 (2007); MISS. CODE ANN. § 11-1-65 (2008); MO. ANN. STAT. § 510.263 (2008); NEV. REV. STAT. § 42.005 (2008); N.C. GEN. STAT. ANN. § 1D-30 (2008); COLO. REV. STAT. § 13-21-102 (2008).

[11] See ARK. CODE ANN. § 16-55-211 (2008); FLA. STAT. ANN. § 768.73 (2008); MINN. STAT. § 549.20 (2008).

individually determine the myriad key <u>contested</u> issues in the case. That, however, is exactly what Plaintiffs have tried to do.

The following list of alleged "common issues" identified by the Plaintiffs do not predominate: (1) whether Defendants' owe a duty to the Plaintiffs, (2) whether Defendants breached that duty by manufacturing or placing in the stream of commerce adulterated frozen ground beef products, and (3) whether the frozen ground beef products were defective and unreasonably dangerous when placed in the stream of commerce. (Ptf. Mem., at 15).[12]  As discussed above, these issues are not "common," as they are subject to the laws of the state in which the transaction occurred, which vary greatly from state to state. These issues also became largely irrelevant once the recall was initiated.

These issues are also largely uncontested. Topps does not contest the fact that some of its ground beef was tainted with *E.coli* O157:H7, that *E.coli* O157:H7 can make people ill, that Topps was obligated not to sell ground beef tainted by *E.coli* O157:H7, or that some people became ill from eating ground beef contaminated with *E.coli* O157:H7.

In *ConAgra*, the court faced similar class certification issues for putative personal injury and purchaser classes after a recall of peanut butter products due to *Salmonella* contamination. In that case, the court refused to grant class certification, noting that "[i]f class certification is denied, these cases will go forward in essentially the same manner they would if a class were certified, only without an expensive, unnecessary, meaningless, and largely uncontested 'common' issues trial." 251 F.R.D. at 701. So too here.

> 2.    Exposure, Injury, Causation, Damages and the Personal Injury Class Members' Unique Medical Backgrounds Create Individual Issues

In mass tort litigation, even if the choice-of-law problem could somehow be accommodated, individual issues of exposure, injury, causation and damages so clearly predominate over any other possible

---

[12] Plaintiffs purport to rely on the expansion of the voluntary recall to demonstrate Topps' liability. (Ptf. Mem., at 15). This is an improper use of a subsequent remedial measure. FED. R. EVID. 407.

common issues that class certification remains untenable. See *MTBE Prods. Liab. Litig.*, 437 F.Supp.2d 298 (denying certification of personal injury class on predominance grounds); *Vioxx*, 239 F.R.D. at 461; *Prempro*, 230 F.R.D. at 566-67 (even if plaintiffs could overcome variations in state law, common questions did not predominate in exposure claim); *Kemp,* 2002 WL 113894 at **3-4 (denying certification to Louisiana personal injury/wrongful death class because common issues did not predominate); *Emig v. Am. Tobacco Co., Inc.,* 184 F.R.D. 379, 392 (D. Kan. 1998) (denying certification of product liability personal injury class of smokers because the class did not satisfy predominance requirements).

These individualized facts will overwhelm the resolution of all putative Personal Injury Class members' claims. Determining whether any individual contracted *E.coli* O157:H7 from ground beef is a highly individualized, fact specific inquiry. (See Ex. E, DuPont Report, p. 5). The damages suffered by a claimant are equally individual and fact specific. Some will have sought medical care, others will not have. Some will have been hospitalized, others will not have. Some will still claim to be suffering symptoms from the exposure to *E.coli* O157:H7, others will not. Some will have missed school or work, others will not have. The "common issues" Plaintiffs propose for trial do not predominate over these genuinely contested and highly individualized matters.

This is a point that the Plaintiffs' own expert witnesses clearly agreed with during their deposition testimony. (See Ex. Q, Marsden Dep., at pp. 47-48; Ex. R, Nataro Dep., at pp. 39-40, 104-105). Plaintiffs' expert, Dr. Marsden, recognized the following highly-individualized inquiries to resolve the Personal Injury Class members' claims:

- Ø For individuals who were not "culture confirmed" for *E. coli* O157:H7, it is necessary to undertake an epidemiological investigation of their exposure to the contaminated products, the timing of their illness and the timing of the onset to make a legitimate determination as to whether they could be part of a Personal Injury class. (Ex. Q, Marsden Dep. at pp. 47-48).

- Ø To ascertain the degree of injury for each individual in the outbreak, one would need to examine each medical condition, review the medical records to identify the severity of the

injury, and any potential future complications that may develop. The only way to know that is to individually investigate the different circumstances, each person's medical course, and each person's current renal function and have that renal function monitored in the future, over their lifetime. (*Id.* at p. 43).

Ø To identify whether Personal Injury Class members complied with the safe handling instructions would require an interview with each individual regarding how they handled the food. (*Id.* at pp. 45-47, 70-71).

Ø To identify whether a deficiency in Topps' HACCP program caused or contributed to an individual's illness, given that more than one production date was involved, would require an investigation into whether that individual consumed the product and the circumstances under which the product was processed. (*Id.* at pp. 72-75).

Even in this case, any damages suffered by a particular claimant are individual and fact-specific:

Ø Jimmy Patton's symptoms lasted for approximately 10 days; Robert Teachout's symptoms lasted for approximately three days; Gary Gregory's symptoms lasted for approximately three to seven days. (First Am. Compl. ¶¶ 3, 4).

Ø The date that both Jimmy Patton's and Robert Teachout's onset of symptoms began falls outside of the CDC epidemiology curve relating to the Topps' outbreak. (Ex. Q, Marsden Dep., at pp. 80, 82-83).

Ø The Plaintiffs' claimed injuries (abdominal cramping, diarrhea, bloody diarrhea) are consistent with symptoms relating to exposure to other types of pathogens. (*Id.* at pp. 81, 83).

Ø Even in confirmed cases, the medical sequelae for an *E. coli* O157:H7 infection can be vastly different among infected individuals. (*Id.* at pp. 35-36).

Further, Plaintiffs do not offer evidence showing that the recalled ground beef products caused any of their illnesses. The personal injury Plaintiffs tested for *E. coli* O157:H7 had <u>negative</u> results. (See Ex. R, Nataro Dep., at pp. 62-63). No doctor has correlated any illness suffered by these Plaintiffs to a recalled product, such as by way of a positive stool culture. (See Ex. Q, Nataro Dep., p. 62; Ex. L, Patton Dep. at pp. 75, 76, Ex. M, Gregory Dep. at pp. 52-55; Ex. P, Teachout Dep. at pp. 29, 43). There were no confirmed cases of illness relating to Topps' recall in Arkansas, where one of the class representatives purchased and ate his meat. (See Ex. D, CDC Press Release, 10/26/07).

These individual issues will overwhelm the few so-called "common issues" that Plaintiffs seek to litigate on a class-wide basis. The minor issues about whether Topps failed to take reasonable steps to prevent *E. coli* O157:H7 contamination (given that a recall due to *E.coli* contamination product occurred) and whether Topps met federal inspection requirements (Ptf. Mem., at 15) are subordinate to the individualized issues of product use, exposure, medical history, injury, causation, environmental factors and damages.[13] Adjudication of personal injury "common issues" do not materially advance the efficient disposition of this litigation.

### C.    Class Certification Is Not The Superior Method of Adjudication

Under Rule 23(b)(3), a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Plaintiffs must proffer a workable plan that is superior to all other methods of resolution. See *Castano*, 84 F.3d at 742-43; *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 455 (E.D. Pa. 2000). Here, Plaintiffs do not even proffer a minimal "trial plan" for the proposed classes. (See Ptf. Mem., generally).

Plaintiffs' claim of "superiority" for their putative Purchaser Class rests almost entirely on the claim that most members of the Class have relatively modest claims and little incentive or ability to prosecute their claims individually. (Ptf. Mem., at 28-29). However, the *Rezulin* court rejected this stratagem out of hand. *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68 (S.D.N.Y. 2002).

---

[13] Liability questions simply cannot be constitutionally bifurcated as Plaintiffs propose. *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000); *Bridgestone/Firestone*, 288 F.3d at 1017 ("No injury, no tort is an ingredient of every state's law"). Bifurcation does not diminish the requirement that a plaintiff show that a violation has caused him injury before a liability finding is made, and Plaintiffs cannot adjudicate a finding of "negligence" or "strict liability" binding on Defendants separate from the determination of whether Defendants' conduct actually caused injury to an individual. See *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978). Defendants' liability to the absent class members for negligence and strict liability cannot be adjudicated in the absence of proof of injury to *each of them* individually.

In addition, Plaintiffs' Motion fails to reference Defendants' refund programs, which provide purchasers of recalled ground beef products with full refunds. The refund program is current and ongoing, and remains available to all consumers, including Plaintiffs and proposed class members. The refund program does not require litigation. It does not require a successful consumer protection claim and does not require a complicated evaluation and reconciliation of conflicting states' laws. The program does not implicate due process or right to jury trial issues. Allowing a Purchaser Class would add only one thing to the refund program already in existence: a heavy "tax" of unneeded and unnecessary attorneys' fees and administrative costs. See *In re PPA*, *supra* (the court found that defendants' existing refund program was superior to plaintiffs' proposed litigation class); *ConAgra*, 251 F.R.D. at 700-01 ("[t]he Defendant's voluntary [refund] program would likely require no more (and probably less) proof that a claimant actually purchased the peanut butter than would be required in litigation. Given these factors, the important policy concern that individuals were not or will not be able to recover because of small individual recoveries is not heavily implicated in this case"). The same is true here.

By any measure, Plaintiffs' proposed class remedy is inferior to Defendants' refund programs. Accordingly, certification should be denied.

**D.     Application of the Four Factors Does Not Support Certification**

      1.   <u>Class Members Have an Interest in Individually Controlling the Prosecution of Separate Actions</u>

A class action is not superior to individual civil suits. As the Supreme Court observed in *Amchem*, "[e]ach plaintiff has a significant interest in individually controlling the prosecution of [his/her case]; each has a substantial stake in making individual decisions on whether and when to settle." *Amchem*, 521 U.S. at 616. That reasoning also applies here.

2.    <u>The Extent of Existing Litigation Does Not Warrant Class Certification</u>

Although Plaintiffs allege there are purportedly thousands of potential claimants in this case, only nine individual personal injury actions have been filed since the recall, suggesting that individual lawsuits, rather than a class action, will be adequate to address possible claims.  This factor does not weigh in favor of class certification.  See *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1191 (9th Cir. 2001) (quoting the lower court's reasoning that "[a]lthough thousands of patients were implanted with the ENCOR lead, only nine lawsuits are pending; this indicates that individual litigation may be sufficient to satisfy potential claims").

3.    <u>Class Treatment Is Not Manageable</u>

Plaintiffs argue that class treatment would be more manageable than individually adjudicating the same issues.  However, as argued above, "because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable," and common issues of law cannot predominate over those affecting individual members of the class.  *Bridgestone/Firestone*, 288 F.3d at 1019; *Rezulin*, 210 F.R.D. at 71.  Courts have consistently refused to certify nationwide class actions where the substantive law of multiple states must be applied, and nothing in this case counsels a different result.

Moreover, there is a wide variation of factual issues among the purported class members.  Among the Purchaser Class, there are purportedly thousands of individual sales at issue, each of which differs from others.  There is also no uniform legal principle to be applied to the claims raised by class members.  As outlined above, there are many individualized issues of fact and law that overwhelm any common issues in this litigation.

## V.    Issue Certification Is Not Proper Under Rule 23(c)(4)

Recognizing the problems that exist with certification under Rule 23(b)(3), Plaintiffs argue that "issue certification" would be justified under the circumstances.  Although under Rule 23(c)(4)(A) an action may sometimes be brought or maintained as to particular issues (so-called "partial certification" or "issue

-32-

certification"), the Constitution prohibits partial certification where a second jury necessarily would need to reexamine facts addressed by the first jury, as clearly is the case here. See *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 424 (5th Cir. 1998). Just as importantly, Rule 23(c)(4) is almost always rejected where the common issues are inextricably tied to the individual issues because the presence of individual issues still makes the case unmanageable.

An "issue certification" trial plan, similar to Plaintiffs' proposal, was considered and rejected in *In re Tetracycline Cases,* 107 F.R.D. 719, 725, 737 (W.D. Mo. 1985). In that case, plaintiffs proposed an initial trial phase that would resolve liability and compensatory damages issues with respect to one or more representative plaintiffs and also deal with four "common questions of law," nine "common questions of fact," and a class-wide assessment of punitive damages. *Id.* at 737. As here, that trial plan contemplated that if plaintiffs prevailed in the "common issues" trial, class members would proceed to trial separately on "individualized" liability and compensatory damages issues. The *Tetracycline* plaintiffs essentially made the same Rule 23(c)(4) arguments Plaintiffs make here. The court rejected the arguments in light of the unmanageability of the claims and the limited degree to which the proposed "common issues" would materially advance a resolution of the issues in the litigation as a whole. See *id.* at 733, 736; see also *Paxil,* 212 F.R.D. at 544-547.

The Second Circuit's Rule 23(c)(4) standard, allowing certification of a class regardless of whether the claim as a whole satisfies the predominance requirement, is more relaxed than that of the Fifth Circuit (which requires that the cause of action as a whole satisfy the requirement). Even applying the more relaxed standard, class certification pursuant to Rule 23(c)(4) must be denied where, as here, significant "individualized issues of reliance, causation, and damages" mean that issue certification "would not meaningfully reduce the range of issues in dispute and promote judicial economy." *Dungan v. Acad. at Ivy*

*Ridge*, 2009 WL 2604356, at *1 (2d Cir. Aug. 20, 2009) (refusing to grant (c)(4) issue certification) (citing *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008)).

While Plaintiffs cite *Arthur Young & Co. v. United States Dist. Court*, 549 F.2d 686, 690 (9th Cir. 1977), as an example of a successful two-stage trial plan (see Ptf. Mem., at 36-37), the *Arthur Young* court applied uniform federal securities law to the class claims, not a myriad of state consumer protection and product liability statutes, like those alleged here. Based on the body of law interpreting federal securities law, the court held that general causation could be determined without the need to establish the claimants' actual reliance. However, in the products liability context, separating "general causation" from "specific causation" is unworkable and does not further the litigation. See *Paxil*, 212 F.R.D. at 544.

## A.    Class Certification Would Not Materially Advance Nor Offer Any Advantage in the Expeditious Resolution of These Cases

When plaintiffs attempt to create "predominance" by limiting the scope of the issues to be addressed through partial certification under Rule 23(c)(4), there is a corresponding *increase* in the importance of the superiority requirement of Rule 23, which is unaffected by the proposal for partial certification. See *Tetracycline Cases*, 107 F.R.D. at 732. Because the proposed class treatment will not actually dispose of any cases, Plaintiffs must demonstrate that class certification will materially advance the final disposition of the litigation as a whole, and that it is the most effective among the available means of handling the *total* controversy.

Plaintiffs do not even pretend that their "trial plan" will eliminate a single trial or that exposure, injury, causation or damages can be determined as common issues. They instead argue that without class certification, the claims of the Personal Injury Class will be "too small to overcome the significant financial and emotional costs of prosecuting an individual suit." (Ptf. Mem., at 2). Even if that were true, the requirements of Rule 23 and the Constitution cannot be ignored simply because it would be expedient to do so. Plaintiffs' argument neglects the self-evident fact that even under their "trial plan," hundreds or thousands

of individual trials with respect to both the Purchaser and Personal Injury Classes will have to be prosecuted whether or not a class is certified. This is hardly a case that is beset with the problem of "aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617. If class certification is denied, these cases will go forward in essentially the same manner they would if a class was certified, only without the heavy "lawyers tax" associated with resolving unnecessary, meaningless and largely uncontested "common" issues.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

Dated:  Buffalo, New York
           December 22, 2009

                                        **NIXON PEABODY LLP**

                                                /s/ Mark A. Molloy
                                        By: _____
                                                Mark A. Molloy, Esq.
                                        *Attorneys for Topps Meat Company, LLC, Wal-Mart*
                                            *Stores, Inc., Pathmark Stores, Inc., Wakefern*
                                            *Foodcorp., d/b/a ShopRite and ShopRite of Kingston*
                                        40 Fountain Plaza, Suite 500
                                        Buffalo, New York 14202
                                        Tel:  (716) 853-8100
                                        Email:  mmolloy@nixonpeabody.com

*Of Counsel:*
Alan M. Maxwell, admitted *pro hac vice*
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
950 East Paces Ferry Road, Suite 3000
Atlanta, GA 30326
Tel: 404-876-2700
Email: amaxwell@wwhgd.com

Christopher T. Lee, admitted *pro hac vice*
Dickie, McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402
Tel: 412-281-7272

-35-

Email: clee@dmclaw.com

*Attorneys for Topps Meat Company, LLC,*
*Wal-Mart Stores, Inc., Pathmark Stores, Inc.,*
*Wakefern Foodcorp., d/b/a ShopRite and ShopRite of Kingston*

12820159.4