UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JIMMY PATTON, ROBERT TEACHOUT,
and GARY GREGORY, for themselves and others      **REPORT AND**
similarly situated,      **RECOMMENDATION**

                Class Plaintiffs,      07-CV-00654(S)(M)

v.

TOPPS MEAT COMPANY, LLC, WAL-
MART STORES, INC., PATHMARK
STORES, INC., WAKEFERN FOODCORP.
d/b/a SHOPRITE and SHOPRITE OF
KINGSTON,

                Defendants.
_____

      Before me is plaintiffs' motion for class certification pursuant to Fed. R. Civ. P.

("Rule") 23 [124],[1] which has been referred to me by Hon. William M. Skretny for a Report and

Recommendation [127]. Oral argument was held on March 22, 2010. For the following reasons,

I recommend that the motion be denied.

## BACKGROUND

      This case arises from the recall of certain frozen ground beef products

contaminated with a bacterium known as E.coli 0157:H7 ("E.coli"), which were manufactured by

defendant Topps Meat Company, LLC and distributed by defendants Wal-Mart Stores, Inc.,

Pathmark Stores, Inc., Wakefern Foodcorp. d/b/a Shoprite, and Shoprite of Kingston.[2] An initial

---

[1]      Bracketed references are to CM-ECF docket entries.

[2]      Defendants Strategic Investments & Holdings, Inc. and Rastelli's Fine Foods were
previously voluntarily dismissed from the case [84 and 86]. Although Pathmark currently remains a
defendant, plaintiffs intend to voluntarily dismiss Pathmark. Plaintiffs' reply memorandum of law [130],

voluntary recall of the products occurred on September 25, 2007, and was expanded by a second

voluntary recall on September 29, 2007 to include a total of approximately 21.7 million pounds of

frozen ground beef products. Molloy declaration [126-2], Exs. B and C.  Investigations by the

Centers for Disease Control and Prevention ("CDC") and the United States Department of

Agriculture's Food Safety and Inspection Service ("USDA") found 40 cases of E.coli infection

traceable to the subject product in eight states.  Plaintiffs' memorandum of law[125], Ex. 4.  To

date, nine individual personal injury actions arising from the recall have been filed.  Defendants'

memorandum of law [126], p. 32.

      The amended complaint asserts causes of action based upon strict liability,

negligence, breach of implied warranty of fitness, negligence *per se*, and violations of the

consumer protection and unfair or deceptive acts or practice statutes of 45 states [5]. [3]  For

purposes of this motion, I assume the allegations of the amended complaint to be true. <u>Kiobel v.

Royal Dutch Petroleum Co.</u>, 2004 WL 5719589, *1 n.1  (S.D.N.Y. 2004).

      Plaintiffs seek to certify two classes arising from the incident: an "injury class",

consisting of "all persons who, on or before September 29, 2007, consumed frozen ground beef

products subject to the September 25 and 29, 2007 recalls and who assert or allege claims

sounding in personal injury therefrom", and a "consumer class", consisting of "all persons who

purchased ground beef products subject to the September 25 and 29, 2007 recalls and who assert

---

p. 7 n. 4.

[3]    Although the amended complaint names Marie Dallaire as a plaintiff, defendants allege - and plaintiffs conceded at oral argument - that she has withdrawn from the case.  Defendants' memorandum of law [126], p. 4, n. 3.

or allege claims sounding in economic losses therefrom". Plaintiffs' memorandum of law [125], pp.1-3.


## ANALYSIS

**A.     Class Certification Standard**

In order to obtain class certification, plaintiffs must "prove that each of the required elements for class certification under Rule 23 has been satisfied." Spagnola v. Chubb Corp., 2010 WL 46017, *11 (S.D.N.Y. 2010). In deciding the motion, the court "must conduct a rigorous analysis to determine whether or not Rule 23's requirements have been met". Shariff v. Goord,  235 F.R.D. 563, 569 (W.D.N.Y. 2006) (Siragusa, J.).

Defendants argue that since the Supreme Court's seminal decision in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997), no non-settlement products liability personal injury classes have been certified.  Defendants' memorandum of law [126], p. 8. Although plaintiffs dispute this claim (plaintiffs' memorandum of law [125], p. 39), the cases upon which they rely are readily distinguishable from the circumstances of this case. *See*, *e.g.*, In re Copley Pharmaceutical, Inc., 161 F.R.D. 456, 458 (D.Wyo. 1995) (predating Amchem and only certifying several common threshold issues, but not causation and damages); In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation,  2001 WL 1842315, *1 (N.D.Ohio 2001) (approving a settlement class); In re Telectronics Pacing Systems, Inc., 137 F.Supp.2d 985, 987 (S.D. Ohio 2001) (same); In re Diet Drugs Products Liability Litigation, 2000 WL 1222042, *1 (E.D.Pa. 2000) (same).  In fact, plaintiffs' counsel conceded at oral argument that he is unaware of any E.coli contamination case receiving class certification.

While this fact does not serve as an absolute bar to certification, it does signify that such cases are generally not conducive to class certification. For the following reasons, I conclude that certification is likewise not appropriate in this case.

**B.      The Proposed Injury Class**

**1.      Certification Under Rule 23(a)**

Rule 23(a) allows a class to be certified "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class". I will analyze only those factors challenged by defendants.

**a.      Rule 23(a)(1): Numerosity**

Plaintiffs argue that the proposed injury class meets the numerosity requirement of Rule 23(a)(1), relying on the 40 cases of E.coli infection reported by the CDC and their expert's testimony that for every diagnosed case, there are 20 undiagnosed cases. Plaintiffs' memorandum of law [125], p. 13, Exs. 4 and 5. I agree.

Although plaintiffs are unable to pinpoint the exact number of class members, "precise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity". Maywalt v. Parker & Parsley Petroleum Co., 147 F.R.D. 51, 55 (S.D.N.Y. 1993); Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993) ("plaintiffs must show some evidence of or reasonably estimate the number of class

members but need not show the exact number"). Applying common sense to the evidence

presented by plaintiff, and given that  "numerosity is presumed at a level of 40 members",

Consolidated Rail Corp. v. Town of Hyde Park, 47 F. 3d 473, 483 (2d Cir.), cert. denied, 515 U.S.

1122 (1995),  I conclude that plaintiffs have satisfied the numerosity requirement. *See*

M.O.C.H.A. Society, Inc. v. City of Buffalo, 2008 WL 343011, *2 (W.D.N.Y. 2008) (Curtin, J.)

("'While there are no rigid numerical guidelines for determining impracticability of joinder, courts

have observed that generally less than 21 is inadequate; more than 40 is adequate; and numbers in

between 21 and 40 are given varying treatment").[4]


      **b.**      **Rule 23(a)(3): Typicality** [5]

     Rule 23(a)(3) requires that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class". "Typicality . . .  requires that the claims of the class

representatives be typical of those of the class, and is satisfied when each class member's claim

arises from the same course of events, and each class member makes similar legal arguments to

---

[4]     Defendants' reliance on McLean v. Merrifield,  2002 WL 1477607 (W.D.N.Y. 2002) (Elfvin, J.), is misplaced.  In McLean, the plaintiffs relied on the fact that there were 708 mentally retarded individuals in Erie County receiving public benefits in attempting to meet the numerosity requirement for a proposed class of such individuals who were denied benefits by reason of their disability.  McLean, 2002 WL 1477607 at *2, 4.  In concluding that the plaintiffs did not meet the numerosity requirement, the court found that they  "do not . . . provide any information regarding how many of those 708 mentally retarded people have been or will be denied public benefits by reason of their disability so as to fall within the proposed class, other than by conclusory stating that '[m]any of these individuals . . . have lost or been denied benefits because of their disability of mental retardation.'"  Id. at *4.  However, in this case the CDC's findings indicate that there are *at least* 40 confirmed cases of E.coli illness arising from the recall.

[5]     Because plaintiffs state that they will voluntarily dismiss Pathmark (plaintiffs' reply memorandum of law [130], p. 7 n. 4), I find no reason to address defendants' arguments directed at opposing a finding of typicality against Pathmark.

prove the defendant's liability." <u>Marisol A. v. Giuliani</u>, 126 F. 3d 372, 376 (2d Cir. 1997). *See*

<u>Koss v. Wackenhut Corp.</u>, 2009 WL 928087, *6 (S.D.N.Y. 2009) ("Defendants' sole contention

against typicality is that some individualized determinations will be required. As in the case of

commonality, however, individual differences do not preclude certification of a class where, as

here, each Plaintiff's claim arises from the same set of facts, and rests on similar legal

arguments.").

   Typicality is not a "terribly exacting hurdle[ ] to overcome - indeed, as numerous

courts have found, even a single common question may be sufficient to satisfy the Plaintiffs'

burden, and the existence of some individualized questions need not destroy . . . typicality".

<u>Spagnola</u>, 2010 WL 46017 at *14. For example, "differences in the damages sustained by

individual class members does not preclude a showing of typicality, nor defeat class certification."

<u>Shariff</u>, 235 F.R.D. at 571.

   However, "where there are particularly unique fact patterns . . . or defenses with

respect to a named plaintiff, the claims of that plaintiff may not be typical of the class, and he or

she may be an inappropriate class representative". <u>Bishop v. New York City Department of

Housing Preservation and Development</u>, 141 F.R.D. 229, 238 (S.D.N.Y. 1992). Thus, "courts

have been reluctant to find typicality in products liability and mass tort actions". 5 <u>Moore's

Federal Practice</u> (3rd ed. 2009) §23.24[8][h]. "The class representative's claims are often atypical

because injuries among class members differ widely and because the facts on which liability will

be based vary significantly from individual to individual." <u>Id.</u> That is the case here.

   While the issue of generic causation (*i.e.*, whether digestion of E.coli

contaminated meat can cause personal injury) may be common to the class, the question of

specific causation - whether the contaminated meat caused the personal injuries of the individual class members - requires an individualized assessment.  *See* In re Agent Orange Product Liability Litigation MDL No., 381, 818 F. 2d 145, 165 (2d Cir. 1987), cert. denied, 484 U.S. 1004 (1988) ("The relevant question . . . is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g. state of health, lifestyle) and the nature of their exposure to Agent Orange"); In re Fosamax Products Liability Litigation, 248 F.R.D. 389, 399 (S.D.N.Y. 2008) ("a plaintiff cannot prevail by proving that, in general, Fosamax could cause a significant increase in the risk of ONJ in some users"); Pasternak v. Upjohn Co., 1994 WL 16495152, **2-4 (E.D.N.Y. 2004).  This is exemplified by the fact that the parties' experts disagree whether E.coli caused the injuries exhibited by the proposed class representatives.  *Compare* report of defendants' expert, Herbert DuPont, M.D. (Molloy declaration [126-2], Ex. E) *with* report of plaintiffs' expert, James Nataro, MD, PhD, MBA (plaintiffs' memorandum of law [125], Ex. 5).

The determination of whether an individual's illness was attributable to E.coli cannot be confirmed by a simple test.  Of the three proposed class representatives, only Patton was tested for E.coli**,** and he tested negative[6] (Molloy declaration [126-2], Ex. E, pp. 4, 7).  According to defendants' expert, Dr. DuPont, "it is virtually impossible to [diagnose illness resulting from a foodborne pathogen] without microbiologic identification of a pathogen in the stool sample." Plaintiffs' reply memorandum of law [130], Ex. 3, p. 16.  However, he also

---

[6]     According to defendants' expert, other tests performed on proposed class representative Patton also "suggest[ed] that he did not have E.coli 0157:H7 diarrhea."  Molloy declaration [126-2], Ex. E, p. 4.

acknowledges that there are a "small percentage of false negatives when you do microbiologic testing". Plaintiffs' reply memorandum of law [130], p.17.

Similarly, causation cannot be established merely by virtue of the fact that an individual experienced diarrhea. Dr. DuPont opines that "in the absence of a causative agent, development of diarrhea after consumption of an implicated food is still more likely to be caused by a non-outbreak cause". Molloy declaration [126-2], Ex. E, p. 5. Even plaintiffs' expert, Dr. Nataro, does not opine that the presence of diarrhea within the incubation period is sufficient to establish causation. Although he states that "if an individual is exposed to a food item that is implicated in an outbreak of foodborne gastrointestinal illness within a plausible incubation period, [it is] more likely than not that the implicated vehicle is the most likely cause of the patient's illness" (plaintiffs' memorandum of law [125], Ex. 5, p. 5), he also admits that the specific backgrounds of the individual plaintiffs, including whether they recently traveled, have a medical history of diarrhea, or consumed raw vegetables, well water or unpasteurized products, may bear upon causation. Plaintiffs' memorandum of law [125], Ex. 5, p. 6; Molloy declaration [126-2], Ex. R, pp. 100-102. Plaintiffs' other expert, James Marsden, Ph.D., similarly testified that whether plaintiffs complied with the safe handling instructions on the product may bear on causation. Molloy declaration [126-2], Ex. Q, pp. 70-71.

Even assuming that the presence of diarrhea alone could establish an injury traceable to the subject product, according to defendants' expert, Dr. DuPont, proposed class representative Teachout's illness fell outside both the onset window of the outbreak and the incubation period compatible with an illness attributable to E.coli. Molloy declaration [126-2],

Ex. E, p. 5.  Likewise, proposed class representative Patton's illness fell outside of the onset window of the outbreak.  Id., p. 4.

Establishing causation may be further complicated because some individuals, like proposed class representative Teachout, did not seek any medical attention, while others, like former proposed class representative Dallaire, failed to develop an illness. Plaintiffs' memorandum of law [125], Ex. 13, interrogatory response no. 6; Molloy declaration [126], Ex. E, p. 4.  Thus, even when addressing the liability claims of only the *three* proposed class representatives, it is apparent that individual fact issues predominate over the common issues.

For these reasons, the issue of causation, which is highly individualized as to each proposed class representative, precludes a finding of typicality as to the proposed injury class.  *See* In re Fosamax Products Liability Litigation, 248 F.R.D. at 400 ("The fourth element, that exposure to Fosamax proximately caused a significant increase in the risk of contracting ONJ, presents an insurmountable obstacle" to establishing typicality).

c.      **Rule 23(a)(4): Fair and Adequate Protection**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  "This entails a two-part inquiry: (1) whether plaintiffs' attorneys are qualified, experienced and able to conduct the litigation and (2) whether the lead plaintiffs' interests are antagonistic to the interests of other members of the class."  In re Fosamax, 248 F.R.D. at 401.

As to the suitability of plaintiffs' counsel, defendants argue that the failure of two of the proposed class representatives to preserve the subject product gives rise to a spoliation

claim and undermines counsel's ability to adequately represent the class. Defendants' memorandum of law [126], p. 18 n.8. However, proposed class representative Teachout testified that counsel instructed him to retain the recalled product, and proposed class representative Gregory testified that his wife disposed of the product. Molloy declaration [126-2], Ex. P. p. 21, Ex. M, pp. 42-43. Therefore, the failure to preserve the product does not reflect upon counsel's ability.

Defendants also argue that the proposed class representatives will not fairly and adequately protect the interests of the classes because they did not suffer the same injury as the proposed consumer class. Defendants' memorandum of law [126], pp. 17-18. However, the proposed class representatives are members of both the proposed injury class and the proposed consumer class having suffered economic injury from their purchase of the recalled product. Plaintiffs' reply memorandum of law [130], p. 8.

Nevertheless, "regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its representation . . . , there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it". Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F. 2d 176, 180 (2d Cir. 1990), cert. denied, 498 U.S. 1025 (1991). As discussed above, establishing causation will be a significant issue in each case and distinct to each potential injury class member. Thus, it is likely that the proposed class representatives will be preoccupied with establishing their own individual claims to the detriment of the other class members. Because none of the proposed class representatives tested positive for E.coli, they will likely have to focus more of their efforts at establishing causation than other potential injury class members who may have tested positive

for E.coli.  *See, e.g.*, <u>Dauphin v. Chestnut Ridge Transportation</u>, 2009 WL 2596636, *3 (S.D.N.Y. 2009) ("Plaintiffs' interstate travel is a unique defense that threatens to become the focus of this litigation.  If a class were certified for plaintiffs' state labor law claim, defendants would inevitably focus on the interstate travel of these plaintiffs as a means of defeating the claim.  That would prejudice absent class members who may have stronger state labor law claims because they did not engage in interstate travel.").

For these reasons, I conclude that the proposed class representatives cannot fairly and adequately protect the interests of the class.


## 2. Certification under Rule 23(b)

Even if plaintiffs could satisfy the Rule 23(a) factors (and they have not), in order to obtain certification they must also satisfy at least one of the criteria of Rule 23(b).[7]


### a. Rule 23(b)(1)[8]

Plaintiffs argue that certification under Rule 23(b)(1)(B) is appropriate because, as a result of defendant Topps' Chapter 7 bankruptcy, the only available source of recovery is Topps' $11 million in insurance coverage, which is insufficient to fully and fairly compensate the class members.  Plaintiffs' memorandum of law [125], pp. 20-22.

---

[7]     Plaintiffs have only sought class certification under Rules 23(b)(1) and (b)(3). Therefore, any argument for certification under Rule 23(b)(2) is deemed waived.  *See* <u>In re Conagra Peanut Butter Products Liability Litigation</u>, 251 F.R.D. 689, 696 (N.D.Ga. 2008).

[8]     This analysis applies equally to certification of  plaintiffs' proposed consumer class.

In Ortiz v. Fibreboard Corp., 527 U.S. 815, 842 (1999), the Supreme Court identified the characteristics "presumptively necessary . . . to satisfy the limited fund rationale for a mandatory action". These conditions include "a 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." Id. at 841. "The burden of justification rests on the proponent of any departure from the traditional norm." Id. at 842. "Because class members are not provided notice or an opportunity to opt out of a class certified under Rule 23(b)(1)(B), the rule is interpreted narrowly." Bowe Bell + Howell Co. v. Immco Employees' Association, 2005 WL 1139645, *5 (N.D.Ill. 2005).

Defendants contend that Topps has $22 million, rather than $11 million, in available insurance coverage, in addition to which there are the assets and insurance coverage of the remaining defendants, including Wal-Mart. Defendants' surreply [134], p. 4. I agree. Thus, plaintiffs have has failed to satisfy their burden of establishing a limited fund. [9]

---

[9]     There is also a substantial question as to whether Rule 23(b)(1)(B) can be used to aggregate the unliquidated claims of the proposed injury class. Although the Supreme Court in Ortiz declined to "decide the ultimate question whether Rule 23(b)(1)(B) may ever be used to aggregate individual tort claims", Ortiz, 527 U.S. at 844, it specifically noted that "it is clear that the Advisory Committee did not contemplate that the mandatory class action codified in subdivision (b)(1)(B) would be used to aggregate unliquidated tort claims on a limited fund rationale." Id. at 843. See Doe v. Karadzic, 192 F.R.D. 133, 140 n. 10 (S.D.N.Y. 2000) ("The Court ostensibly left for another day the question of whether this subdivision may ever be used to aggregate individual tort claims. . . . Nevertheless, its requirement of strict adherence to the traditional limited fund model may have sounded the death knell for mass tort suits under Rule 23(b)(1)(B).").

### b.    Rule 23(b)(3)

Under Rule 23(b)(3) plaintiffs must show that "questions of law *or* fact common to the class members predominate over any questions affecting only individual members," *and* that the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy" (emphasis added).  The factors pertinent to this inquiry include the class members' interest in individually controlling the prosecution of separate actions, the extent of any litigation previously commenced by or against the class members, the desirability of concentrating the litigation in a single forum, and the likely difficulties in managing the class action. Rule 23(b)(3)(A)-(D).

### I.    Do Common Questions of Law Predominate?

Plaintiffs argue that New York law should apply because Topps, the primary defendant, is a New York corporation and the other defendants are either registered to do business in New York or have their principal place of business in New York.  Plaintiffs' memorandum of law [125], p. 23.

"To certify a multi-state class action, a plaintiff must prove through extensive analysis that there are no material variations among the law of the states for which certification is sought . . . . A district court should deny certification if the plaintiff fails to carry this burden." Conagra, 251 F.R.D. at 696. Because the potential plaintiffs span  45 states (amended complaint [5], ¶¶62-106),  I must first determine if New York law conflicts  with the other states' laws. *See* In re St. Jude Medical, Inc., 425 F.3d 1116, 1120 (8th Cir. 2005) ("There is, of course, no constitutional injury to out-of-state plaintiffs in applying Minnesota law unless Minnesota law is

in conflict with the other states' laws. Therefore, we must first decide whether any conflicts actually exist").

Plaintiffs fail to dispute defendants' claim that there are differences in the consumer protection, strict liability, negligence and punitive damage laws of the states at issue. Defendants' memorandum of law [126], pp. 23-26. Instead, plaintiffs argue that it is constitutionally permissible for New York's substantive law to apply to plaintiffs' claims even if it differs from the laws of the other states. Plaintiffs' reply memorandum [130], pp. 10-11. "For a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818 (1985). "In tort cases, New York courts apply an interests analysis . . . . Interests analysis determines which State has the greater interest in having its law applied." Brink's Ltd. v. South African Airways,  93 F.3d 1022, 1031 (2d Cir. 1996), cert. denied, 519 U.S. 1116 (1997).

Plaintiffs argue that "Defendants had every expectation to be held liable under the substantive laws of the State of New York" because defendants Topps and Shoprite of Kingston are New York corporations and the other defendants are registered to do business in New York State. Plaintiffs' memorandum of law [125], p. 23.  However, this argument ignores the expectations of the potential plaintiffs - who span 45 states (amended complaint [5], ¶¶62-106) - as to whether New York law would apply to their claims. This omission cannot be overlooked, because  "the location of consumers' purchases . . . assumes special significance". In re Relafen Antitrust Litigation,  221 F.R.D. 260, 278 (D.Mass. 2004).

"States have a strong interest in protecting consumers with respect to sales within their borders, but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states." In re Grand Theft Auto Video Game Consumer Litigation, 251 F.R.D. 139, 149 (S.D.N.Y. 2008). *See also* Utility Consumers' Action Network v. Sprint Solutions, Inc., 259 F.R.D. 484, 487 (S.D.Cal. 2009) ("The Court must consider the expectation of the parties in considering fairness. . . . The Plaintiffs have failed to show that California has a significant aggregation of contacts that create a California interest in applying its law nationally. The Plaintiffs have not shown that application of the California law to non-residents is neither arbitrary nor unfair. It is reasonable to assume that when non-California residents entered into contracts with the Defendants, they were availing themselves of the laws of their states, the defendant's home states or the state that was designated in the contract, rather than California statutory law"); In re St. Jude Medical, Inc., 425 F. 3d at 1120 ("Application of Minnesota law to all plaintiffs' claims ultimately may be proper, although we suspect Minnesota lacks sufficient contacts with all the parties' claims, and the different states have material variances between their consumer protection laws and Minnesota's. There is no indication out-of-state parties had any idea that Minnesota law could control potential claims when they received their Silzone-coated valves"); Shutts, 472 U.S. at 821-22 ("Kansas must have a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests, in order to ensure that the choice of Kansas law is not arbitrary or unfair . . . . Given Kansas' lack of interest in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas

law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits").

"An individualized choice-of-law analysis *must* be applied to each plaintiff's claim in a class action." In re St. Jude Medical, Inc., 425 F. 3d at 1120; Georgine v. Amchem Products, Inc., 83 F. 3d 610, 627 (3d Cir. 1996), aff'd, Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) ("Because we must apply an individualized choice of law analysis to each plaintiff's claims . . . the proliferation of disparate factual and legal issues is compounded exponentially."). However, by ignoring the individual class members' connections to New York, plaintiffs wholly fail to make this showing.

Plaintiffs further argue the class members will have agreed to the application of New York law by virtue of their participation in the classes, since if the classes are certified, those preferring application of another state's laws can simply opt out of the class. Plaintiffs' memorandum of law [125], p. 24. However, plaintiffs' argument ignores that choice of law principles remain paramount to plaintiffs choice of forum. *See* Shutts, 472 U.S. at 820 ("We also give little credence to the idea that Kansas law should apply to all claims because the plaintiffs, by failing to opt out, evinced their desire to be bound by Kansas law. Even if one could say that the plaintiffs consented to the application of Kansas law by not opting out, plaintiff's desire for forum law is rarely, if ever controlling. In most cases the plaintiff shows his obvious wish for forum law by filing there. If a plaintiff could choose the substantive rules to be applied to an action . . . the invitation to forum shopping would be irresistible").

For these reasons, I conclude that plaintiffs have failed to prove that common questions of law predominate.

### ii.    Do Common Questions of Fact Predominate?

Defendants argue that while there are common issues regarding duty and breach (which are "largely uncontested" by defendants), questions of exposure, injury, causation and damages are distinct to each class member. Defendants' memorandum of law [126], pp. 26-30. I agree.

As discussed above, the highly individualized question of specific causation predominates in this case. A finding of "general causation" would do little to advance this litigation. The injuries plaintiffs allegedly sustained also differ widely and require individualized adjudication. Of the 40 confirmed cases of E.coli infection, some individuals developed kidney failure, whereas others, like the proposed class representatives, only experienced diarrhea. Plaintiffs' memorandum of law [125], Ex. 4.

### iii.   Do the Factors of Rule 23(b)(3)(A)-(D) Weigh in Favor of Class Certification?

Plaintiffs allege that the average recovery for claims involving E.coli is $1,400,000. Plaintiffs' reply memorandum of law [130], p. 3. With such potentially high recoveries at stake, "each plaintiff has a significant interest in individually controlling the prosecution of separate actions. . . . This is not a case where the amounts at stake for individuals [are] so small that separate suits would be impracticable. . . . Rather, this action involves claims for personal injury and death-claims that have a significant impact on the lives of the plaintiffs and that frequently receive huge awards in the tort system." Georgine, 83 F.3d at 633. Further, it is undisputed that only *nine* individual personal injury actions arising from the recall have been

filed thus far (defendants' memorandum of law [126], p. 32), which strongly suggests that individual litigation is sufficient. *See* <u>Zinser v. Accufix Research Institute, Inc</u>., 253 F.3d 1180, 1191 (9th Cir. 2001), <u>opinion amended on other grounds</u>, 273 F.3d 1266 (noting that the district court had found that "'although thousands of patients were implanted with the ENCOR lead, only nine lawsuits are pending; this indicates that individual litigation may be sufficient to satisfy potential claims").

Accordingly, I recommend that plaintiffs' motion to certify the proposed injury class be denied.


### 3. Issue Certification Pursuant to Rule 23(c)(4)

Alternatively, plaintiffs argue that even if they fail to meet their burden for class certification under Rules 23(b)(1) or 23(b)(3), that issue certification can be granted under Rule 23(c)(4). Plaintiffs' memorandum of law [125], p. 33.

Rule 23(c)(4) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Plaintiffs assert claims for negligence, negligence per se, strict liability, breach of the implied warranty of fitness and violations of various state consumer protection and unfair and deceptive acts or practices statutes. Amended complaint [5]. Among these claims are issues of liability that are common to all members of the injury class (*e.g.*, general causation) and may be resolved by application of uniform laws (*e.g.*, "the definition of negligence [and] strict liability . . . is substantially identical

in all jurisdictions" In re Telectronics Pacing Systems, Inc., Accufix Atrial J Leads Products Liability Litigation,  164 F.R.D. 222, 230 (S.D.Ohio 1995)).[10]

However, these issues are not  likely to be heavily contested (if at all) by defendants.  Thus, "a finding of 'general causation' would do little to advance this litigation". Harding, 165 F.R.D. at 630. "Given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy".  McLaughlin v. American Tobacco Co., 522 F.3d 215, 234 (2d Cir. 2008). Therefore, I recommend that plaintiffs' request  for issue certification be denied.


C.      **The Proposed Consumer Class**

1.      **Certification Under Rule 23(a)**

a.      **Typicality**

Defendants argue that the proposed class  representative plaintiffs seek recovery for alleged personal injuries rather than economic loss, and therefore did not suffer the same injury as those sought to be prosecuted by the proposed consumer class.  Defendants' memorandum of law [126], p. 17. However, plaintiffs respond that the proposed class representatives fall within both classes because they suffered personal injury as a result of exposure to E.coli *and* economic injury from purchasing the subject product.  Plaintiffs' reply [130], p. 8.

---

[10]      *Cf.* Harding v. Tambrands Inc.,  165 F.R.D. 623, 629 (D.Kan.1996),  rearg. denied, 168 F.R.D. 290 (D.Kan 1996) ("There is no one standard of negligence, for example, which would be applicable to all members of the plaintiff class. The law of negligence is not uniform and cannot be abstracted into a single instruction.").

Alternatively, defendants argue that two of the proposed class representatives no longer possess the product in question, having discarded it after filing the lawsuit. Defendants' memorandum of law [126], p. 17. Given the nature of this suit, I presume that other potential plaintiffs likely did not retain the product and instead simply retained the packaging, sales receipt or other proof of purchase. Given the low threshold for determining typicality, I find that plaintiffs have met the typicality requirement for the consumer class.

2.     **Certification under Rule 23(b)(3)**

a.     **Is a Class Action a Superior Method of Adjudicating the Claims of the Consumer Class?**

Rule 23(b)(3) requires plaintiffs to establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy". Defendants argue that their existing and ongoing refund programs, which provide purchasers of the subject products with full refunds, are a superior method of adjudication. Defendants' memorandum of law [126], p. 31. Plaintiffs respond that the refund program does not constitute an adjudication of the claims. Plaintiffs' reply memorandum of law [130], p. 12.

There is conflicting authority from other Circuits on whether an out-of-court refund program constitutes a method of adjudication for purposes of Rule 23(b)(3). *Compare* Conagra, 251 F.R.D at 699-700 (finding out-of-court refund program for contaminated peanut butter to constitute a superior form of adjudication) *with* Turner v. Murphy Oil USA, Inc., 234 F.R.D. 597, 610 (E.D.La. 2006) ("The analysis is whether the class action format is superior to other methods of adjudication, not whether a class action is superior to an out-of-court, private settlement

program"). However, following the authority from this Circuit, I conclude that defendants' refund

program constitutes a superior form of adjudication to plaintiffs' proposed consumer class. *See*

Berley v. Dreyfus & Co., 43 F.R.D. 397, 398-99 (S.D.N.Y. 1967) ("Although Dreyfus & Co.'s

offer to refund the purchase price to its customers is not quite 'another method for the fair and

efficient adjudication of the controversy,' we think that subparagraph (b)(3) read as a whole

reflects a broad policy of economy in the use of society's difference-settling machinery. One

method of achieving such economy is to avoid creating lawsuits where none previously existed.

This is in part why 'the extent and nature of any litigation . . . already commenced' is pertinent to

the required finding. If a class of interested litigants is not already in existence the court should

not go out of its way to create one without good reason."); 7AA Wright and Miller, Federal

Practice and Procedure (Civil) §1779 (2010) ("The court need not confine itself to other available

'judicial' methods of handling the controversy in deciding the superiority of the class action").

Plaintiffs further argue that defendants have offered no specifics of their refund

programs. Plaintiffs' reply memorandum of law [130], p. 12. However, defendants rely on the

affidavit of Thomas Bolinger of Wal-Mart [126-13] and declaration of Cheryl Macik of

Wakefern [126-12], which describe the refund programs.

Plaintiffs' counsel argued for the first time at oral argument that the refund

programs are deficient because they require proof of purchase, which most consumers do not

retain, whereas the proposed consumer class would permit potential class members to establish

their membership in the class by providing affidavits that they purchased the subject product.

However, even if this argument had been timely raised by plaintiffs, I would reject it. *See* In re

Phenylpropanolamine (PPA) Products Liability Litigation, 214 F.R.D. 614, 622 (W.D.Wash.

2003) ("The court finds proof of purchase requirements for refund programs an extraordinarily commonplace practice amongst retailers and . . . a necessary requirement for class identification purposes"). Therefore, I find that plaintiffs have failed to establish that the proposed consumer class action is superior to other methods of adjudication.

Accordingly, I recommend that plaintiffs' motion for certification of the proposed consumer class be denied.[11]

## CONCLUSION

For these reasons, I recommend that plaintiff's motion for class certification [124] be denied.

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by June 14, 2010 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

---

[11]    Because I have recommended that plaintiffs' motion for class certification be denied, I find no reason to address defendants' arguments concerning whether the proposed class definitions are adequate. Even if the proposed class definitions were not adequate, they could be modified without defeating certification. *See* <u>In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation</u>, 241 F.R.D. 435, 438 (S.D.N.Y. 2007) ("It is well-established that a court has the inherent power and discretion 'to redefine and modify a class in a way which allows maintenance of an action as a class action.'"); 5 <u>Moore's Federal Practice (3ed 2009)</u>, 23.21[6].

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), may result in the district judge's refusal to consider the objection.

**SO ORDERED.**

DATED:   May 27, 2010

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge